**Electronically Filed
Supreme Court
SCOT-17-0000777
30-OCT-2018
09:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---oOo---

_____

IN THE MATTER OF CONTESTED CASE HEARING RE
CONSERVATION DISTRICT USE APPLICATION (CDUA) HA-3568
FOR THE THIRTY METER TELESCOPE AT THE MAUNA KEA SCIENCE
RESERVE, KAʻOHE MAUKA, HĀMĀKUA, HAWAIʻI, TMK (3)404015:009

_____

SCOT-17-0000777, SCOT-17-0000811, & SCOT-17-0000812

APPEAL FROM THE BOARD OF LAND AND NATURAL RESOURCES
(BLNR-CC-16-002 (Agency Appeal))

OCTOBER 30, 2018

RECKTENWALD, C.J., MCKENNA, J., and
CIRCUIT JUDGE CASTAGNETTI IN PLACE OF NAKAYAMA, J., RECUSED,
WITH POLLACK, J., CONCURRING IN PART, WITH WHOM WILSON, J.,
JOINS AS TO PARTS I-III, AND WILSON, J., DISSENTING

<u>OPINION OF THE COURT BY MCKENNA, J., IN WHICH
POLLACK, J., JOINS EXCEPT AS TO PART V.C.1</u>

## I.    Introduction

These appeals were filed from a September 27, 2017 decision of the Board of Land and Natural Resources ("BLNR") authorizing issuance of a Conservation District Use Permit for the Thirty Meter Telescope near the summit of Mauna Kea.

Appellant Native Hawaiian[1] cultural practitioners believe that Mauna Kea, as a sacred manifestation of their ancestry, should be honored in its natural state and is desecrated by development of astronomy facilities near its summit.  In contrast, Appellees submit that telescope use is an allowed and appropriate use of the summit area, that various measures are being taken to reduce the impact of the TMT, and that Mauna Kea can also be honored through the advancement of scientific knowledge that TMT would provide.

In this opinion, we address whether the BLNR properly applied the law in analyzing whether a permit should be issued for the TMT.  Upon careful consideration of the written submissions, the applicable law, and the oral arguments, and for the reasons explained below, we now affirm the BLNR's decision authorizing issuance of a Conservation District Use Permit ("CDUP") for the Thirty Meter Telescope ("TMT").

---

[1]     The term "Native Hawaiian" refers to one "whose ancestors were natives of the Hawaiian Islands prior to 1778, without regard to blood quantum," while the term "native Hawaiian" refers to one with at least fifty percent Hawaiian ancestry.  Melody Kapilialoha MacKenzie & D. Kapuaʻala Sproat, A Collective Memory of Injustice:  Reclaiming Hawaiʻi's Crown Lands Trust in Response to Judge James S. Burns, 39 U. HAW. L. REV. 481, 528 (2017).  See also JON M. VAN DYKE, WHO OWNS THE CROWN LANDS OF HAWAIʻI? 1 n.1 (2008) (using the term "Native Hawaiian" to "refer to all persons descended from the Polynesians who lived in the Hawaiian Islands when Captain James Cook arrived in 1778," and distinguishing it from the term "native Hawaiian," which is defined as a person with 50 percent or more Hawaiian blood in the Hawaiian Homes Commission Act, 1920, ch. 42, sec. 201(a)(7), 42 Stat. 108 (1921)).

## II.  Factual and Procedural Background

### A.    The Mauna Kea Summit

Some Native Hawaiians, including some of the appellants, consider Mauna Kea, which rises to an elevation of 13,796 feet above sea level, to be an ancestor, a living family member and progenitor of Hawaiians, born of Wākea (Sky Father) and Papa (Earth Mother). They consider the Mauna Kea summit area, also known as Kūkahau'ula (cluster of pu'u or cinder cones), to be a wahi pana (storied place) and wao akua (the place where gods reside), the realm of ancestral akua (gods, goddesses, deities) believed to take earthly form as the pu'u, the waters of Lake Waiau, and other significant landscape features.  The summit of Mauna Kea is thought to touch the sky in an unique and important way, as a piko (navel) by which connections to the ancestors are made known to them, or as the piko ho'okahi (the single navel), which ensures spiritual and genealogical connections, and the rights to the regenerative powers of all that is Hawai'i.  The large number of shrines on Mauna Kea indicate that there was a pattern of pilgrimage, "a walk upward and backward in time to cosmological origins," to worship the snow goddess Poli'ahu and other akua such as Kūkahau, Līlīnoe, and Waiau.  As discussed later, various Native Hawaiian traditional and customary practices are derived from these beliefs, which have also led to related contemporary cultural practices.

3

Before Western contact, the summit area was considered kapu (taboo) to all but the highest chiefs and priests, and unavailable to the general public. Archaeological research also indicates that from as early as 1100 A.D., and continuing through the 1700s up until the time of Western contact, Native Hawaiians mined extremely high quality, dense, blue-black basalt in a 4,800 acre adze quarry on the southern slopes of Mauna Kea concentrated between 11,500 and 12,400 square feet above sea level to produce tools to cut trees, shape canoes, and carve other smaller items.

**B.    Development of Modern Astronomy on Mauna Kea Summit**

After statehood, in 1968, the BLNR entered into a General Lease with the University of Hawaiʻi ("University") for the Mauna Kea Science Reserve ("MKSR"); the General Lease is scheduled to terminate on December 31, 2033.  The MKSR totals 11,288 acres, consisting of a 10,763-acre cultural and natural preserve and a 525-acre Astronomy Precinct, and includes almost all of the land on Mauna Kea above the 12,000-foot elevation, except for certain portions that lie within the Mauna Kea Ice Age Natural Area Reserve ("MKIANAR").

The General Lease allows the University to use the MKSR as a scientific complex and reserve.  The University began operating the first observatory on Mauna Kea in 1968. Thereafter, the following additional astronomical observatories

4

became operational in the summit region of the MKSR:  the University 2.2-meter Telescope (1970), the United Kingdom Infrared Telescope ("UKIRT")(1979)(now owned by the University), the NASA Infrared Telescope Facility (operated by the University)(1979), the Canada-France-Hawaiʻi Telescope (1979); (5) the California Institute of Technology ("Caltech") Submillimeter Observatory ("CSO")(1986), the James Clerk Maxwell Telescope ("JCMT")(1986)(now owned by the University), the Very Long Baseline Array (1992), the W. M. Keck Observatory, first phase (1992) and second phase (1996), the Subaru Observatory ("Subaru")(1999), the Gemini North Observatory (1999), and the Submillimeter Array (2002).  The 4.6 mile segment of Mauna Kea Access Road just past the Onizuka Center for International Astronomy (also known as Hale Pōhaku),[2] located at the 9,200 foot level of Mauna Kea, is unpaved until just above 11,600 feet, where it then extends near to the summit and loops along the Puʻu Kea, Puʻu Hauʻoki, and other puʻu to reach existing observatories through paved or unpaved driveways.  The roads have also increased access to the summit area of Mauna Kea for at least some Native Hawaiian cultural practitioners.

Construction of these observatories and roads has had significant cumulative adverse impacts on cultural,

---

[2]    The University also manages the Hale Pōhaku mid-level facilities and the Summit Access Road between Hale Pōhaku and the MKSR, including 400 yards on either side of the road, but excluding the MKIANAR.

archaeological, and historic resources in the MKSR.  The observatories have also had significant cumulative adverse impacts on geology, soils, and slope stability in the MKSR because they significantly modified the preexisting terrain, the tops of certain pu'u were flattened to accommodate observatory foundations, and some materials removed from the pu'u were pushed over their sides, creating steeper slopes more susceptible to disturbance.

In response to significant criticism raised in a 1998 audit, the University's Board of Regents ("BOR") adopted the MKSR Master Plan ("Master Plan") in 2000, which updated management guidelines for the areas of Mauna Kea managed by the University, including the MKSR.  The Master Plan established the Office of Mauna Kea Management ("OMKM"), housed in the University of Hawai'i at Hilo ("UHH").  The OMKM is advised by volunteer residents of the Big Island of the Mauna Kea Management Board and Kahu Kū Mauna (Guardians of the Mountain) to effectuate the Master Plan's goals of (1) protecting cultural, natural, educational/scientific, and recreational resources; (2) preserving and protecting the cultural and natural landscape; (3) preserving and managing cultural resources and practices for future generations; (4) defining areas for use of cultural, natural and recreational resources; (5) protecting the right to exercise traditional cultural

practices; (6) allowing for sustainable, integrated planning and management; and (7) protecting and enhancing astronomy research.

The Master Plan identifies five types of astronomy development and their locations within the 525-acre Astronomy Precinct area of the MKSR, described as Areas A through F, for redevelopment or expansion of existing observatory facilities. These locations include Area E, intended for development of a next generation large telescope, such as the TMT.

After preparation of the Master Plan, a Comprehensive Management Plan was also finalized in April of 2009.  Various sub-plans were also prepared, including a Cultural Resources Management Plan and a Decommissioning Plan for the decommissioning of existing telescopes.

## C.   The TMT

In 2003, Caltech and the University of California formed the TMT Corporation, a California non-profit public benefit corporation, for the purpose of fostering astronomy through building a thirty meter telescope.  In 2008, the TMT Corporation, in consultation with the University, began assessing the development of the TMT in Area E, on the northwest slope of Mauna Kea, below the summit ridge.  This location was selected for a next generation large telescope (1) due to its significant distance from historical and cultural sites, including Kūkahauʻula and Lake Waiau, (2) to minimize visibility

from significant cultural areas on the summit and from Waimea, Honoka'a and Hilo, (3) to reduce wind shear forces, (4) because it is not a good wēkiu bug habitat, and (5) to minimize its potential to obscure astronomical observations by existing observatories.  On May 23, 2009, a draft Environmental Impact Statement ("EIS") for the TMT was published; some of the Appellants submitted comments before issuance of the May 8, 2010 Final EIS.

TMT International Observatory, LLC ("TIO") was formed on May 6, 2014 as a nonprofit organization comprised of the Regents of the University of California, Caltech, the National Institutes of Natural Sciences of Japan, the National Astronomical Observatories of the Chinese Academy of Sciences, the Department of Science and Technology of India, and the National Research Council of Canada, and succeeded TMT Corporation as owner of the TMT project.  TIO was formed so that the voting power and telescope observing time could vary amongst its members proportionate to their respective contributions to the TMT Project.

The TMT would be the first optical/infrared observatory of its size to integrate adaptive optics, which corrects for image distortion caused by the atmosphere, into its design.  The proposed TMT project actually consists of four components, the TMT observatory within Area E ("TMT Observatory"), an access way

from the Mauna Kea Access Road ("Access Way"), upgrades to existing transformers at the electrical substation near Hale Pōhaku in the mid-level of Mauna Kea, and a headquarters in Hilo. With respect to construction of the TMT Observatory, the observatory dome, support building, and the area disturbed during construction would be about five acres ("the TMT Observatory site"). The issues on appeal in this case focus on the proposed TMT Observatory and Access Way.

The ground surface of the proposed TMT Observatory is 600 feet below the summit ridge. The proposed TMT Observatory would have a total height of roughly 180 feet above that ground surface, with an exterior radius of 108 feet and a dome shutter 102.5 feet in diameter.

Conservation District Use Application ("CDUA") HA-3568 for the TMT was originally submitted on September 2, 2010. The BLNR initially granted a CDUP on April 12, 2013. In our December 2, 2015 opinion in Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 363 P.3d 224 (2015) ("Mauna Kea I"), we vacated the Circuit Court of the Third Circuit's May 5, 2014 order affirming the BLNR's issuance of the first CDUP. We held that the BLNR's approval of a CDUP before conducting a contested case hearing violated the due process rights of parties with standing to assert Native Hawaiian traditional and customary rights. Mauna Kea I, 136 Hawai'i at 390-91, 363 P.3d at 238-39. We also

held that a state agency must perform its functions in a manner that fulfills the State's affirmative obligations under the Hawai'i Constitution.  Mauna Kea I, 136 Hawai'i at 414, 363 P.3d at 262 (Pollack, J., concurring, in which Wilson, J., joined, and McKenna, J., joined as to Part IV).  We therefore ordered a remand to the BLNR for a contested case hearing before the Board or a new hearing officer.  Mauna Kea I, 136 Hawai'i at 399, 363 P.3d at 247.

On remand, the BLNR appointed a hearing officer, retired Third Circuit judge Riki May Amano ("Hearing Officer" or "Amano"), who conducted a contested case hearing over forty-four days, on the following dates in 2016 and 2017:  October 20, 24-27, and 31; November 2 and 15-16; December 1-2, 5-6, 8, 12-13, 16, and 19- 20; January 3-5, 9-12, 19, 23-26, and 30-31; February 13-16, 21-23, and 27-28; and March 1-2.  The Hearing Officer issued her "Proposed Findings of Fact, Conclusions of Law, and Decision and Order" on July 26, 2017.

After submission of exceptions to the proposed decision and responses to the exceptions and oral arguments, on September 27, 2017, the BLNR issued its 271-page Findings of Fact, Conclusions of Law and Decision and Order ("BLNR Decision and Order") containing 1070 Findings of Fact ("FOF" singular or "FOFs"

10

plural) and 512 Conclusions of Law ("COL" singular or "COLs" plural).[3]

Five of seven board members, BLNR Chairperson Case and members James A. Gomes, Thomas H. Oi, Samuel "Ohu" Gon III, and Christopher Yuen signed the BLNR Decision and Order to indicate agreement.  Members Stanley H. Roehrig and Keith "Keone" Downing signed with the notation "I do not concur[.]"

Pursuant to Act 48 of 2016,[4] direct appeals were filed to this court.[5]

---

[3]    Due to the length of the BLNR Decision and Order, many of the specific FOFs, COLs, and CDUP conditions referenced in this opinion are not quoted. The entire BLNR Decision and Order is available on-line at https://perma.cc/H49Z-XN7B.

[4]    Act 48 of 2016, effective August 1, 2016, added Hawaiʻi Revised Statutes § 183C-9 to make final decisions and orders from contested cases concerning conservation districts directly appealable to this court.  2016 Haw. Sess. Laws Act 48, §§ 2 & 14 at 76, 82.

[5]    In SCOT-17-0000777, the appellants are Petitioners-Appellants Mauna Kea Anaina Hou ("MKAH") and its President Kealoha Pisciotta, Clarence Kukauakahi Ching, Flores-Case ʻOhana, Deborah J. Ward, Paul K. Neves, and KAHEA:  The Hawaiian Environmental Alliance (collectively the "MKAH Appellants").  The MKAH Appellants' previous appeal resulted in our December 2, 2015 opinion in Mauna Kea I.  SCOT-17-0000811 was filed by Intervenor-Appellant Temple of Lono ("Appellant Temple of Lono" or "Temple").  SCOT-17-0000812 was filed by Intervenors-Appellants Mehana Kihoi, Joseph Kualiʻi Camara, Leinaʻala Sleightholm, Kalikolehua Kanaele, Tiffnie Kakalia, Brannon Kamahana Kealoha, Cindy Freitas, William Freitas ("Kihoi Appellants"), and Intervenor-Appellant Harry Fergerstrom ("Appellant Fergerstrom").  The appellees are the BLNR, the State of Hawaiʻi Department of Land and Natural Resources ("DLNR"), the State of Hawaiʻi (the "State"), and Suzanne D. Case ("Case"), in her official capacity as Chair of the BLNR (usually collectively referred to as the "BLNR"), and the University of Hawaiʻi at Hilo ("UHH").  Intervenors-appellees are TMT International Observatory, LLC ("TIO") and Perpetuating Unique Educational Opportunities, Inc. ("PUEO").  A fourth appeal, SCOT-17-0000705, filed on October 10, 2017, by Intervenor-Appellant Dwight J. Vicente, was dismissed on March 15, 2018 based on a failure to file an opening brief after notice was provided.

### III.  Points of Error on Appeal

The great majority of the BLNR's FOFs and COLs are not challenged on appeal.  The points of error that are alleged on appeal by the various Appellants are categorized and summarized as follows:[6]

### A.    Disqualification Issues

1.    Whether the BLNR erred by refusing to disqualify Amano as the Hearing Officer based on her family membership in the 'Imiloa Astronomy Center;

2.    Whether the BLNR erred by refusing to disqualify Deputy Attorneys General who had advised the BLNR in Mauna Kea I from continuing to advise the Hearing Officer and the BLNR in the contested case hearing after remand;

3.    Whether the BLNR erred by overruling objections to the participation of BLNR members Yuen and Gon in the contested case hearing after remand.

### B.    Native Hawaiian Rights Issues

1.    Whether the BLNR fulfilled its duties under Article XII, Section 7 and Kā Pa'akai o Ka 'Āina v. Land Use Commission;

2.    Whether the BLNR erred in concluding that the Hawai'i Constitution does not protect contemporary native Hawaiian cultural practices;

3.    Whether the TMT Project violates religious exercise rights of Native Hawaiians protected by federal statutes;

4.    Whether the Hearing Officer should have allowed briefing and a hearing on a motion to disqualify UHH as applicant based on its alleged hostility toward the traditional Hawaiian faith;

---

[6]    Various appellants raise various issues on appeal, some which are duplicated by other appellants and some of which are asserted by only one appellant.  Appellants raising the various issues are sometimes identified.

5.     Whether the Hearing Officer should have allowed briefing and a hearing on a motion to dismiss based on violation of the desecration statute of the Hawai'i Penal Code;

6.     Whether the Hearing Officer should have excluded challenges to the legal status of the State of Hawai'i and its ownership of Mauna Kea as well as the existence of the Kingdom of Hawai'i.

### C.    Public Trust and Land Use Issues

1.     Whether the TMT Project violates Article XI, Section 1 of the Hawai'i Constitution and public trust principles;

2.     Whether conditions of Hawai'i Administrative Rules ("HAR") § 13-5-30(c) (1994) for issuance of a CDUP were satisfied.

### D.    Other Procedural Issues

1.     Whether the original CDUA should have been stricken and a new CDUA required;

2.     What the nature of the proceeding was below, and whether there is an appropriate record on appeal;

3.     Whether TIO and PUEO should have been admitted as parties;

4.     Whether the Hearing Officer's scheduling of presentations by the parties violated Appellants' due process rights;

5.     Whether the Hearing Officer improperly failed to issue final orders in a timely fashion;

6.     Whether the Hearing Officer improperly failed to provide reasoned explanations for her orders;

7.     Whether the Hearing Officer improperly failed to provide required rulings and explanations for thousands of proposed findings of fact;

8.     Whether the entire proceeding was not legitimate.

## IV. Standards of Review

The standards for reviewing each of the points of error alleged on appeal are set out in Hawai'i Revised Statutes ("HRS") § 91-14(g) (2012 & Supp. 2016), "Judicial review of contested cases," which provides as follows:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3); findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6). Save Diamond Head Waters LLC v. Hans Hedemann Surf, Inc., 121 Hawai'i 16, 24-25, 211 P.3d 74, 82-83 (2009).

Pursuant to HRS § 91-14(g), an agency's conclusions of law are reviewed de novo. United Pub. Workers, AFSCME, Local 646, AFL-CIO v. Hanneman, 106 Hawai'i 359, 363, 105 P.3d 236, 240 (2005).

14

An agency's exercise of discretion will not be overturned unless arbitrary, or capricious, or characterized by a clearly unwarranted exercise of discretion.  Paul's Elec. Serv. Inc. v. Befitel, 104 Hawaiʻi 412, 417, 91 P.3d 494, 499 (2004) (citing HRS § 91-14(g)(6)).

In the next section, we analyze each point of error based on the applicable standard of appellate review.[7]  We provide additional factual and procedural background information as appropriate.

### V.   Discussion of Points of Error on Appeal

**A.   Disqualification Issues**

**1.   Whether the BLNR erred by refusing to disqualify Amano as the Hearing Officer based on her family membership in the ʻImiloa Astronomy Center**

**a.   Background**

Appellants assert that the BLNR erred by refusing to disqualify Amano as the Hearing Officer based on her family membership in the ʻImiloa Astronomy Center ("ʻImiloa").  After our remand in Mauna Kea I, the BLNR delegated the conduct of the contested case hearing to a hearing officer, pursuant to HAR § 13-1-32(b) (2009), and through the procurement process of HRS § 103D-304 (2012).  The BLNR appointed a committee of three, consisting of retired Hawaiʻi Supreme Court Associate Justice

---

[7]     Some points of error are addressed in footnotes.

15

James E. Duffy, Jr., Deputy Attorney General Stella Kam, and BLNR Member Christopher Yuen, to evaluate hearing officer applicants.  The BLNR issued Minute Order No. 1, attaching Amano's disclosure statement as Exhibit 1 and setting a deadline for any objections to her appointment.

Appellants objected to Amano's selection, citing Mauna Kea I, 136 Hawai'i at 389, 363 P.3d at 237 ("[J]ustice can perform its high function in the best way only if it satisfies the appearance of justice." (quoting Sifagaloa v. Bd. of Trs. of the Emps. Ret. Sys., 74 Haw. 181, 189, 840 P.2d 367, 371 (1992)) (emphasis omitted).  They argued Amano could not be impartial because she was a dues paying member of 'Imiloa, which is a part of UHH.  They pointed out that TIO is listed on the website as a corporate member of 'Imiloa, and that 'Imiloa had benefited and would benefit from the TMT Project, as it was among the recipients of over $100,000 in contributions to outreach activities already made by TIO,[8] and, as stated in the Final EIS, the TMT Project "will work with . . . 'Imiloa to develop exhibits that reflect the nationally-recognized natural resources" of the area.

---

[8]   It is unclear how much 'Imiloa received of the over $100,000, but according to the Final EIS, these amounts were contributed from 2008-10 and other recipients included the Akamai Intern program, the Waiākea High School Robotics program, the IfA Elementary School Robotics program, the Journey to the Universe program, Kona teachers' workshops, a DOE mentoring program workshop, and intern employment.

Amano then filed a supplemental disclosure stating she had been unaware that ʻImiloa was connected to UHH and that it had not crossed her mind that ʻImiloa was or could be connected to the instant case.  She further stated that her family membership to ʻImiloa had been active since April 2008 with annual dues of $85, and it was set to expire and would not be renewed.  She indicated she had visited ʻImiloa five to six times since 2008 and had used the 10% restaurant and gift shop discount an average of three times per year.  She also stated that when she and her husband joined ʻImiloa, it seemed to them like a membership-based cultural organization like the Japanese Cultural Center of Hawaiʻi and the Bishop Museum on Oʻahu.

Appellants filed supplemental objections additionally arguing that the membership reflected Amano's personal and financial support of the astronomy mission of UHH, which includes development of the TMT Project.  Appellants asserted that, at minimum, an appearance of a conflict or an appearance of impropriety existed, requiring disqualification.[9]

In Minute Order No. 4, the BLNR denied the objections, ruling that the membership does not confer a right to participate in ʻImiloa's governance.  The BLNR noted that in

---

[9]    Appellants also argued below and on appeal standards governing an arbitrator's duties of disclosure under HRS Chapter 658A, which do not apply and are not further discussed.

17

accordance with Sussel v. City & Cty. of Honolulu Civil Serv.
Comm'n, 71 Haw. 101, 108, 784 P.2d 867, 871 (1989),
administrative adjudicators are disqualified for an "appearance
of impropriety," which is similar to the standard for the
disqualification of judges.  The BLNR noted that Hawai'i Revised
Code of Judicial Conduct ("HRCJC") Rule 2.11(a) (2014) requires
disqualification of a judge if "the judge's impartiality might
reasonably be questioned."[10]  The BLNR reasoned that even if

_____

[10]    HRCJC Rule 2.11(a)(2)(A) and (C) (2014) provide:

> Subject to the rule of necessity, a judge shall
> disqualify or recuse himself or herself in any proceeding
> in which the judge's impartiality* might reasonably be
> questioned, including but not limited to the following
> circumstances:
> . . . .
> (2)  The judge knows* that the judge, the judge's spouse or
> domestic partner,* or a person within the third degree of
> relationship* to either of them, or the spouse or domestic
> partner* of such a person is:
>       (A) a party to the proceeding, or an officer,
> director, general partner, managing member, or trustee of a
> party;
> . . . .
>       (C) a person who has more than a de minimis* interest
> that could be substantially affected by the
> proceeding. . . .

The starred terms are defined as follows:

> *"Impartiality" means "absence of bias or prejudice in
> favor of, or against, particular parties or classes of parties,
> as well as maintenance of an open mind in considering issues that
> come or may come before a judge."  "Knows" means "actual
> knowledge of the fact in question.  A person's knowledge may be
> inferred from circumstances."  "Third degree of relationship"
> "includes the following persons related to the judge by blood or
> marriage: great-grandparent, grandparent, parent, uncle, aunt,
> brother, sister, child, grandchild, great-grandchild, nephew, and
> niece."  "De minimus" in the context of interests pertaining to
> disqualification of a judge, means "an insignificant interest
> that could not raise a reasonable question regarding the judge's
> impartiality."  "Terminology," HRCJC.

18

'Imiloa was classified as a party based on its affiliation with UHH, the Hearing Officer's family membership did not create the fiduciary or managerial relationship between an adjudicator and party precluded by HRCJC Rule 2.11(a)(2)(A).  The BLNR opined that no reasonable person would infer that the possible benefits from the membership would cause Amano not to be impartial.  The BLNR concluded that the membership was a "de minimus" interest under HRCJC Rule 2.11(a)(2)(C)[11] that did not rise to the level of an "appearance of impropriety."  The BNLR characterized Amano's membership as akin to a museum membership, not a membership in an advocacy group.

The BLNR also concluded that the membership "does not remotely resemble the prejudgment found objectionable in . . . [Mauna Kea I]" where the BLNR had voted on the merits of the CDUA before holding the contested case hearing.  It ruled that Amano's membership did not show personal and financial support of the astronomy mission at UHH.  It also ruled that exposure to 'Imiloa's exhibits about astronomy on Mauna Kea did not imply prejudgment, and that the Hearing Officer's entitlement to a "presumption of honesty and integrity" remained intact.  The BLNR also accepted Amano's representation and found that Amano

---

[11]    See supra note 10.

19

did not know 'Imiloa was part of UHH or that it had any connection with the CDUA.

The BLNR also discussed whether it should exercise its discretion to replace the Hearing Officer despite a lack of grounds for disqualification.  It declined to do so because Amano had been selected as the most qualified applicant by the committee.

Appellants filed a motion for reconsideration.  Both UHH and TIO responded that the motion should be denied on the merits, but to preemptively eliminate any basis for further delays and appeals, they requested that an alternative hearing officer be appointed.  The BLNR denied the motion, stating it would be nearly impossible to find a hearing officer who subjectively appears fair to every possible person interested in the TMT Project.  The BLNR also noted that the Appellants had not objected to Amano's disclosed involvement in mediating employment disputes involving UHH, which arguably demonstrated more substantive connections to UHH.

Appellants filed a motion for reconsideration.  Both UHH and TIO responded that the motion should be denied on the merits, but to preemptively eliminate any basis for further delays and appeals, they requested that an alternative hearing officer be appointed.  The BLNR denied the motion, stating it would be nearly impossible to find a hearing officer who

20

subjectively appears fair to every possible person interested in the TMT Project. The BLNR also noted that the Appellants had not objected to Amano's disclosed involvement in mediating employment disputes involving UHH, which arguably demonstrated more substantive connections to UHH.

Appellants later filed a renewed motion to disqualify, asserting Amano should be disqualified because Amano (1) had not ruled on Appellants' motions to disqualify the BLNR's and the Hearing Officer's counsel and to strike the CDUA and/or for summary judgment, (2) allegedly disregarded cultural protocol in accessing Mauna Kea during the site visit, (3) was escorted to the restroom by armed and uniformed DLNR Enforcement ("DOCARE") officers who stood guard at hearings, showing her fear of the parties, (4) had allegedly ridden in a vehicle with a UHH employee for the site visit, (5) had a connection to Deputy Attorney General Harvey Henderson, and (6) did not require UHH to disclose witness statements, exhibits, and position statements before the Appellants' deadlines.

The renewed motion was also denied by the BLNR. With respect to the new arguments, the BLNR ruled: (1) the lack of a ruling on two motions, out of more than fifty filed by the parties, did not evidence an appearance of impropriety; (2) not following Appellants' proposed site visit route also did not evidence an appearance of impropriety; (3) the presence of

DOCARE officers did not evidence bias, as the officers protect the safety of everyone present; (4) Amano had been driven on the site visit by a DOCARE officer, not a UHH employee; (5) Amano's connection with Henderson did not evidence bias, as her connection was limited to having attended law school with his wife, who was also a member of the Board of Governors of Maximum Legal Services Corporation, for which Amano served as Executive Director; and (6) there was no evidence of bias based on Amano's setting of deadlines.

### b.  Analysis

On appeal, the parties repeat the arguments they made below.  Preliminarily, Appellants' additional argument, that UHH and TIO should be judicially estopped from arguing that the BLNR did not err in denying disqualification, lacks merit.  The issue on appeal is whether Amano should have been disqualified. Judicial estoppel prohibits parties from taking inconsistent positions.  Lee v. Puamana Cmty. Ass'n, 109 Hawai'i 561, 575–76, 128 P.3d 874, 888–89 (2006).  UHH and TIO have consistently argued that there was no basis for disqualification; thus, judicial estoppel does not apply.

Turning to the merits, we review the alleged due process violation de novo, but we are bound by relevant factual findings made by the BLNR unless they are clearly erroneous.  The BLNR found that Amano did not know 'Imiloa was part of UHH or that it

22

had any connection with the TMT application, that ʻImiloa membership is akin to a museum membership and is not a membership in an advocacy group, that the membership does not confer a right to participate in ʻImiloa's governance, that the membership did not show personal and financial support of the astronomy mission at UHH, and that exposure to ʻImiloa's exhibits about astronomy on Mauna Kea did not imply prejudgment. These findings are not clearly erroneous. The BLNR also ruled that no reasonable person would infer that the possible benefits from the membership would cause Amano not to be impartial. These rulings of law are not wrong.

With respect to the applicable law, the BLNR properly concluded that "an administrative adjudicator should [not] be allowed to sit with impunity in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on [the adjudicator's] impartiality." Sussel, 71 Haw. at 109, 784 P.2d at 871 (citation omitted), and that administrative adjudicators are held to the same standard as judges. The BLNR also concluded that, like judges, administrators serving as adjudicators are presumed to be unbiased. Sifagaloa, 74 Haw. at 192, 840 P.2d at 372, and that this presumption is rebutted only by a showing of a disqualifying interest, either pecuniary or institutional, or both. See id.

The BLNR applied the correct test for impropriety:  whether a reasonable person knowing all the facts would doubt the impartiality of Amano, or whether the circumstances would cause a reasonable person to question Amano's impartiality.  We agree that the circumstances of this case did not rebut the presumption that Amano would be capable of impartially performing her duties.  Amano's connection to 'Imiloa was too attenuated, as her connection was not shown to be anything other than a membership, no different than a membership of a member of the general public.  The membership did not represent an unusual commitment to 'Imiloa, different from what any other member might have.  Membership alone does not lead to a conclusion that a member supports a mission to build the TMT, even assuming that this is 'Imiloa's mission.  No disqualifying interest was shown and the circumstances did not fairly give rise to an appearance of impropriety and reasonably cast suspicion on her impartiality. For the reasons given by the BLNR, the bases for disqualification asserted in the renewed motion for reconsideration are also without merit.  Therefore, there was no error in the denial of the requests to disqualify the Hearing Officer.

2.    **Whether the BLNR erred by refusing to disqualify Deputy Attorneys General who had advised the BLNR in <u>Mauna Kea I</u> from continuing to advise the Hearing Officer and the BLNR in the contested case hearing after remand.**

MKAH Appellants assert that the BLNR erred by denying their motion to disqualify Deputy Attorneys General Julie China and William Wynhoff (collectively "the DAGs"), who had represented the BLNR in the first appeal leading to <u>Mauna Kea I</u>.  Appellants argue these DAGs should have been disqualified based on <u>White v. Bd. of Educ.</u>, 54 Haw. 10, 501 P.2d 358 (1972).  They also assert the DAGs should have been disqualified because they conferred with UHH and TIO attorneys during the pendency of the appeal in <u>Mauna Kea I</u> regarding arrests and prosecution of individuals on Mauna Kea.

In <u>White</u>, a public school teacher requested a hearing due to a proposal to terminate her employment.  54 Haw. at 11, 501 P.2d at 360.  After the hearing officer had prepared proposed findings of fact and conclusions of law, the deputy attorney general who had represented the Superintendent of Education in the adversary hearing against the teacher advised the Board of Education as decision maker with respect to the hearing officer's findings and conclusions.  54 Haw. at 16, 501 P.2d at 363.  We held that a deputy attorney general who had acted as counsel for the Superintendent against the teacher in the

adversary hearing should not have been consulted by the Board in its decision making capacity.  Id.

White is distinguishable.  With respect to the issues in this case, the DAGs advised and represented the DLNR, BLNR, and the Hearing Officer in their adjudicative capacities and not as adversaries of the Appellants.[12]  Appellants also assert the DAGs should also have been disqualified because they conferred with counsel for UHH and TIO regarding the arrests and prosecution of protesters on Mauna Kea.  As argued by the BLNR, however, it is the DAGs' duty "to administer and render legal services to . . . the State departments and offices as the governor may direct." State v. Klattenhoff, 71 Hawai'i 598, 602, 801 P.2d 548, 550 (1990), abrogated on other grounds by State v. Walton, 133 Hawai'i 66, 324 P.3d 876 (2014).  It is also their duty to "give advice and counsel to the heads of departments . . . and other public officers, in all matters connected with their public duties, and otherwise aid and assist them in every way requisite to enable them to perform their duties faithfully." HRS § 28-4 (1993).  The DAGs had a duty to advise the BLNR with respect to legal issues regarding possible conferral of trespassing charges

---

[12]   The Intermediate Court of Appeals made a similar distinction in Kilakila 'O Haleakalā v. Bd. of Land & Nat. Res., No. CAAP-13-3065, 2014 WL 5326757 (App. Oct. 17, 2014)(mem.), in affirming the BLNR's denial of Kilakila's motion to disqualify the deputy attorney general who had represented the BLNR in an adjudicative capacity in both proceedings. Kilakila, mem. op. at 38-39, 2014 WL 5326757, at *25.

to county prosecutors.  These legal issues differ from the issues involved in this appeal as to whether a CDUP should have been granted.

Therefore, even if the DAGs represented the BLNR in an adversarial position as to whether to confer trespassing charges to county prosecutors regarding Mauna Kea protests, the adversarial representation was not with respect to whether a CDUP should have been authorized after the remand.  Indeed, as the BLNR points out, if the BLNR had determined that no CDUP should issue, the DAGs would have been responsible for defending that decision.

The DAGs have always been required to assist the BLNR in a manner to enable the Board to perform its duties faithfully. Their duty never changed, and they have consistently represented the interests of the BLNR.  This differs from White, in which the deputy attorney general first represented the Superintendent, then the BOE, who could have had differing interests.

For all of these reasons, the BLNR did not err in denying Appellants' motion to disqualify based on White.

3. **Whether the BLNR erred by overruling objections to the participation of BLNR members Yuen and Gon in the contested case hearing after remand.**

Appellants argue that the BLNR committed a due process violation by overruling their objections to the participation of

27

BLNR members Christopher Yuen ("Yuen") and Samuel Gon ("Gon") in the proceedings after remand. Due process requires disqualification where "circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on the adjudicator's impartiality." Kilakila ʻO Haleakalā v. Bd. of Land & Nat. Res., 138 Hawaiʻi 383, 425, 382 P.3d 195, 237 (2016) ("Kilakila III") (Pollack, J., dissenting) (citations omitted). The test for prejudgment in an agency context is "whether a disinterested observer may conclude that (the agency) has in some measure adjudged the facts as well as the law . . . in advance of hearing the matter." Mauna Kea I, 136 Hawaiʻi at 395, 363 P.3d 243 (citation omitted). As noted earlier, administrative adjudicators are, however, entitled to a "presumption of honesty and integrity." Sifagaloa, 74 Haw. at 193, 840 P.2d at 372.

a.    Yuen's participation

Soon after the Hearing Officer was appointed, Appellants filed objections asserting Yuen should be disqualified. By Minute Order No. 9 dated June 3, 2016, the BLNR overruled these objections. On appeal, Appellants' reassert their arguments below regarding Yuen's participation. Appellants point to a 1998 interview of Yuen published online by environment-hawaii.org in which Yuen made statements regarding Mauna Kea, which Appellants characterize as "strong and favorable opinions

and positions of future telescope development."  Specifically, Appellants take issue with the following statements made by Yuen during the interview:

> For all the criticism and the auditors [sic] report —
> I just don't see a lot of harm that's been done to those
> resources [historic sites, archaeological sites, bug
> communities, cleanliness of the area, public safety issues,
> some culturally significant areas] by the astronomy
> facilities being put up there and with all this activity in
> the last 20—25 years.
>
> . . . .
>
> The auditor's report was critical.  There were some
> delays.  The big archaeological study was late, certainly
> the arthropod study was delayed.  But if you try to
> identify what has gone wrong — has something been destroyed
> or lost?  Again, apart from just the thing that you have
> all those domes sticking up there, it's been done in a
> pretty responsible way.
>
> There are people that don't like having all those
> buildings up there — which is a valid point of view, but
> the basic decision was made almost 20 years ago.  And,
> honestly, I don't see what difference it would make to have
> a few more telescopes up there as long as you site them
> properly.  It doesn't make a qualitative change in the
> mountaintop if you do that.

The MKAH Appellants focus on two lines to assert Yuen had prejudged the CDUA: "[H]onestly, I don't see what difference it would make to have a few more telescopes up there as long as you site them properly.  It doesn't make a qualitative change in the mountaintop if you do that."

Yuen's comments, however, also contained criticism of telescope projects.  The quotation above contains his comments delays in completing studies.  He also criticized the manner in which the Subaru telescope had been constructed, which involved the grading out of pu'u and potential destruction of bug

habitats.  He also stated that Mauna Kea "is a very important, prominent place" and that individuals who "don't like having all those buildings up there" had a "valid point of view."  He opined that, unfortunately, the State had already irrevocably changed the landscape nearly twenty years ago when it first allowed telescopes.  He also stated that any future telescope project would need, at minimum, to be "site[d] . . . properly," meet the demands of good stewardship, and leave intact habitat and archaeological and cultural sites.

Thus, Yuen's comments, made in 1998, did not indicate he would approve all future telescope applications.  In the context of the entirety of Yuen's comments, the BLNR did not err in ruling that the circumstances did not fairly give rise to an appearance of impropriety and did not reasonably cast suspicion on Yuen's impartiality.  See Kilakila III, 138 Hawai'i at 425, 382 P.3d at 237 (Pollack, J., dissenting).

Appellants also argue that Yuen should have been disqualified because he had been a member of the panel that selected Amano and had voted on Appellants' motions to disqualify her.  There is no due process violation  based on this assertion.[13]

---

[13]  To the extent Appellants also argue a statutory basis for disqualification, Appellees correctly respond that Yuen was appointed to the BLNR pursuant to HRS § 171-4(b) (1993 & Supp. 2005), which requires that the
(continued. . .)

Thus, Yuen's disqualification was not required by due process, and the BLNR did not err by denying Appellants' request to disqualify him.

### b.   Gon's participation

Appellants first objected to Gon's participation during closing arguments before the BLNR.  Appellants reiterate their argument below that Gon should have been disqualified because he had previously voted and signed off on the original CDUP vacated by Mauna Kea I.  During their appeal of the first CDUP, however, Appellants represented they were not seeking recusal of any member of the BLNR.  See Mauna Kea I, 136 Hawai'i at 398, 363 P.3d at 246.  In addition, Mauna Kea I remanded the case for a second contested case hearing "before the Board or a new hearing officer," not a new Board.  Mauna Kea I, 136 Hawai'i at 399, 363 P.3d at 247.  Moreover, there is no legal authority requiring a Board member to be disqualified because he had approved a decision that is later vacated and remanded. If such authority

(continued. . .)
BLNR have at least one member "with a background in conservation and natural resources."  HRS § 84-14 (1993 & Supp. 2012) then provides:

> A person whose position on a board, commission, or committee is mandated by statute, resolution, or executive order to have particular qualifications shall only be prohibited from taking official action that directly and specifically affects a business or undertaking in which the person has a substantial financial interest; provided that the substantial financial interest is related to the member's particular qualifications.

(Emphasis added).  There was no allegation or evidence that Yuen has a substantial financial interest in the TMT Project.

existed, no vacated decision could ever be remanded to the same board or lower court judge.[14]

Thus, Gon's disqualification was not required by due process, and the BLNR did not err by denying Appellants' request to disqualify him.

**B.   Native Hawaiian Rights Issues**

> **1.   Whether the BLNR fulfilled its duties under Article XII, Section 7 and <u>Kā Pa'akai o Ka 'Āina v. Land Use Commission</u>**

The protection of Native Hawaiian traditional and customary rights is enshrined in Article XII, section 7 of the Hawai'i Constitution, which provides as follows:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

These rights of Native Hawaiians who inhabited the Hawaiian Islands before 1778 are property interests protected by the due process clause of Article I, section 5 of the Hawai'i Constitution.  <u>Flores v. Bd. of Land and Nat. Res.</u>, 143 Hawai'i

---

[14]   Like Yuen, Gon was appointed to the BLNR as a member with "particular qualifications," in Gon's case pursuant to HRS § 171-4(c) (1993 & Supp. 2014) as a member "with demonstrated expertise in native Hawaiian traditional and customary practices."  Like Yuen, Gon is statutorily prohibited from taking official action only where it "directly and specifically affects a business or undertaking in which [he] has a substantial financial interest."  HRS § 84-14(a).  <u>See</u> <u>supra</u> note 13.  There is also no allegation or evidence that Gon has a substantial financial interest in the TMT Project.

114, 126, 424 P.3d 469, 481 (2018) (citing Mauna Kea I, 136 Hawaiʻi at 390, 363 P.3d at 238).

In Public Access Shoreline Hawaii v. Hawaiʻi Cty. Planning Comm'n ("PASH"), we reaffirmed the State's obligation to protect the reasonable exercise of customary and traditionally exercised rights of Hawaiians to the extent feasible.  79 Hawaiʻi 425, 450 n.43, 903 P.2d 1246, 1271 n.43 (1995).  Then in Kā Paʻakai o Ka ʻĀina v. Land Use Comm'n, we set out an analytical framework "to help ensure the enforcement of traditional and customary Native Hawaiian rights while reasonably accommodating competing private development interests."  94 Hawaiʻi 31, 35, 7 P.3d 1068, 1072 (2000).  We held that in order to fulfill its duty to preserve and protect customary and traditional Native Hawaiian rights to the extent feasible, as required by Article XII, Section 7 of the Hawaiʻi Constitution, an administrative agency must, at minimum, make specific findings of fact and conclusions of law as to the following: (1) the identity and scope of valued cultural, historical, or natural resources in the relevant area, including the extent to which traditional and customary Native Hawaiian rights are exercised in the area; (2) the extent to which those resources –— including traditional and customary Native Hawaiian rights —– will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the agency to reasonably protect Native Hawaiian

33

rights if they are found to exist.  Kā Pa'akai, 94 Hawai'i at 47, 7 P.3d at 1084.  MKAH and Kihoi Appellants assert that the BLNR failed to meet these obligations.[15]

---

[15]    Appellants preliminarily assert that in COL 82, the BLNR improperly shifted the burden of establishing Native Hawaiian cultural and traditional practices from itself to them.  In this regard, they appear to conflate the procedural requirements imposed by Kā Pa'akai on administrative agencies with the burden of proof imposed on Native Hawaiian practitioners, arguing that our cases place the burden of proof on practitioners only in criminal cases, and not in civil cases.  The burden of proof is not at issue because Kā Pa'akai concerns procedural requirements placed on agencies in order to protect Native Hawaiian rights.  In any event, Appellants' assertion that our cases do not recognize any burden on practitioners in civil cases is erroneous. **[236:37-38]**  In State v. Hanapi, a criminal case, we stated:

> In order for a defendant to establish that his or her conduct is constitutionally protected as a native Hawaiian right, he or she must show, at minimum, the following three factors.  First, he or she must qualify as a "native Hawaiian" within the guidelines set out in PASH . . . [as] "those persons who are 'descendants of native Hawaiians who inhabited the islands prior to 1778,' . . . regardless of their blood quantum."  Second, once a defendant qualifies as a native Hawaiian, he or she must then establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice. . . . Finally, a defendant claiming his or her conduct is constitutionally protected must also prove that the exercise of the right occurred on undeveloped or "less than fully developed property."

89 Hawai'i 177, 185-86, 970 P.2d 485, 493-94 (1998) (citations and emphasis omitted).  State v. Pratt, 127 Hawai'i 206, 277 P.3d 300 (2012), another criminal case, reaffirmed the Hanapi factors and added the additional requirement that any Native Hawaiian rights be balanced against the State's right to regulate Native Hawaiian traditional and customary practices. Pratt, 127 Hawai'i at 218, 277 P.3d at 312.

     In placing the burden of proof on the native practitioner, however, the Hanapi court had drawn all three factors from PASH, a land use case involving a contested case hearing over a special management area permit.  Hanapi, 89 Hawai'i at 185-86, 970 P.2d at 493-94.  Additionally, the Pratt court noted that Paty (a case involving the exchange of ceded lands) had been remanded for the Native Hawaiian practitioners "to prov[e] that the [Native Hawaiian] practice is traditional and customary," in addition to "show[ing] that it meets 'the other requirements of Kalipi [v. Hawaiian Trust Co., 66 Haw. 1, 656 P.2d 745 (1982)],'" which were that the land the practitioners sought to enter was undeveloped or less than fully developed, and that no actual harm result from the cultural practices.  Pratt, 127 Hawai'i at 215, 277 P.3d at 309 (citing Pele Def. Fund v. Paty, 73 Haw. 578, 621, 837 P.2d 1247, 1272

(continued. . .)

The Kā Pa'akai analysis is designed to effectuate Article XII, Section 7 and protect rights traditionally and customarily exercised by Native Hawaiians for subsistence, cultural and religious purposes.  The first step of the analysis required the BLNR to make specific findings and conclusions about the identity and scope of valued cultural, historical, or natural resources in the relevant area, including the extent to which traditional and customary Native Hawaiian rights are exercised in the area.  The BLNR made numerous findings of fact and conclusions of law in this regard.[16]

The issues on appeal relate to Native Hawaiian cultural resources, and we therefore focus our discussion on these issues.  In addition to testimonial evidence, in reaching its findings, the BLNR had available numerous recent research studies, plans, and impact assessments documenting cultural

_____

(continued. . .)
(1992)).  Thus, the burden upon Native Hawaiian practitioners set forth in Hanapi and Pratt is not limited to the criminal context and is drawn from the civil context, with its origin in PASH, a land use case.  We need not decide if Kā Pa'akai implicitly placed any evidentiary burden on the applicants because, as discussed infra, the BLNR's conclusion that no cultural or traditional practices existed at the TMT site is affirmatively supported by substantial evidence.

[16]    See FOFs 175-225 regarding HAR § 13-5-30(4) on pp. 219-25, 531-567 on pp. 91 to 98 regarding biologic resources, 568-675 on pp. 98 to 116 regarding archaeological and historic resources, FOFs 676-839 on pp. 116-55 regarding cultural resources and practices, FOFs 840-860 on pp. 155-58 regarding visual and aesthetic issues, FOFs 861-888 on pp. 158-63 regarding hydrology and water resources, and COLs 365-437 on pp. 244-54.

resources on Mauna Kea, including Native Hawaiian traditional and customary practices.[17]

In summary, the BLNR found that the majority of Native Hawaiian cultural practitioners on Mauna Kea conduct their practices at the summit of Mauna Kea (Puʻu Wēkiu), Lake Waiau, Puʻu Līlīnoe, or Kūkahauʻula.  Cultural practices at Mauna Kea include solstice and equinox observations on Puʻu Wēkiu, burial blessings, depositing of piko (umbilical cord) near Lake Waiau as well as collection of its water for use in healing and ritual practices, the giving of offerings and prayers at the ahu lele (sacrificial altar or stand), behind the visitor center adjacent to Hale Pōhaku, monitoring or observing the adze quarry, or observing stars, constellations, and the heavens.

The BLNR found no evidence, however, of Native Hawaiian cultural resources, including traditional and customary practices, within the TMT Observatory site area and the Access

---

[17]    The Kihoi Appellants allege in Point of Error B(2) that the BLNR erred by stating that Article XII, Section 7 does not protect contemporary Native Hawaiian cultural practices.  In Hanapi, we stated, "To establish the existence of a traditional or customary native Hawaiian practice, we hold that there must be an adequate foundation in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice."  89 Hawaiʻi at 187, 970 P.2d at 495 (footnote omitted; emphases added).  Also, PASH defined a "customary" native Hawaiian usage as one that "must have been established in practice" as of "November 25, 1892. . . ."  PASH, 79 Hawaiʻi at 447, 903 P.2d at 1268.  Thus, Native Hawaiian cultural practices are protected by Article XII, Section 7 if there is an adequate foundation connecting the practice to a firmly rooted traditional or customary Native Hawaiian practice that was established as of November 25, 1892.  The BLNR properly analyzed the cultural practices at issue under this standard.

Way, which it characterized as the relevant area.  There was no physical evidence that the TMT Observatory site was used for storing piko, iwi (bones of the dead), placenta or other artifacts.  There was no evidence of ahu (shrine or altar), lele (sacrificial altar), or other historic properties therein. There was also no evidence of mele (song, anthem, or chant) or hula being performed in the area.  After extensive surveying, no archaeological or historic sites or burials were found in any of the TMT Observatory site or Access Way areas.

The BLNR also analyzed Native Hawaiian cultural resources in the vicinity of the TMT Observatory and the Access Way. Native Hawaiians had erected ahu in the general vicinity of the TMT Observatory site.  The closest, consisting of a single upright stone and several support stones, is 225 feet away, another is 1300 feet away, and a third is 1600 feet away. The BLNR concluded that the two ahu built on the Access Way in 2015 as protests against the TMT did not constitute a traditional and customary right or practice, and in any event did not meet PASH's requirement of reasonableness.  PASH, 79 Hawai'i at 447, 903 P.2d at 1268.

The BLNR conducted a thorough analysis as required by the first step of the Kā Pa'akai analysis.  The BLNR found no Native Hawaiian cultural resources or traditional or customary practices within the TMT Observatory site and Access Way areas.

It correctly concluded that the two ahu constructed on the TMT Access Way in 2015 as protests against TMT are not protected as Native Hawaiian traditional or customary rights.

The second step of the Kā Pa'akai analysis required the BLNR to make findings regarding the extent to which cultural resources -— including traditional and customary Native Hawaiian rights -— will be affected or impaired by the proposed action. The BLNR found that the TMT Project will not adversely impact cultural resources, whether in the relevant area of the TMT Observatory site and Access Way, or in other areas of Mauna Kea. If the three ahu in the vicinity of the TMT Observatory site are within the relevant area, the BLNR found that the TMT would not affect them.  Also, if the summit is considered to be within the relevant area, the BLNR found that the TMT Observatory will not be visible from Lake Waiau, Pu'u Līlīnoe, or Kūkahau'ula, which are culturally sensitive areas of the summit of Mauna Kea, and that the TMT would not impact the other cultural practices discussed above.  The BLNR also found that since 2000, cultural and/or spiritual practices have been occurring while astronomy facilities have existed, and that those activities would not be prevented by the TMT Observatory, which would be located 600 feet below the summit ridge.

The third Kā Pa'akai requirement requires findings regarding the feasible action, if any, to be taken to reasonably protect

Native Hawaiian rights if they are found to exist.  Native Hawaiian rights were not found to have been exercised in the relevant area, so the third requirement was not required to be addressed.  In any event, the BLNR discussed measures that had been taken to avoid impact on Native Hawaiian rights and practices in the Mauna Kea summit area[18] and imposed special conditions to avoid impacts on those practices.[19]

---

[18]    FOF 747 states:

> The University and TIO have established measures to avoid and minimize direct and indirect impacts on cultural practices, including but not limited to the following:
>
> (1) selecting a site off of the Kūkahau'ula summit and away from known historic and traditional cultural properties and cultural resources;
> (2) selecting a site that minimizes the impact of the TMT Project on viewplanes;
> (3) complying with all applicable provisions of the CMP and sub-plans;
> (4) engaging in direct and regular consultation with Kahu Kū Mauna, with the broader Hawai'i Island community, and with cultural practitioners on various issues;
> (5) establishing an outreach office to engage with the larger community;
> (6) developing and implementing a Cultural and Natural Resources Training Program for all TMT staff and construction workers; and
> (7) minimizing TMT Observatory operations (up to 4 days per year) to accommodate cultural activities on culturally sensitive days of the year.

[19]    Special Conditions 30, 34, and 36 provide as follows:

> 30. Should historic remains such as artifacts, burials or concentration of charcoal be encountered during construction activities, work shall cease immediately in the vicinity of the find, and the find shall be protected from further damage.  The contractor shall immediately contact the State Historic Preservation Division . . . which will assess the significance of the find and recommend an appropriate mitigation measure, if necessary; the Applicant will also notify the Office of Hawaiian Affairs at the same time;

(continued. . .)

The MKAH Appellants also challenge the following two conditions imposed by the BLNR for issuance of the CDUP, alleging that they demonstrate that "preservation and protection of native Hawaiian rights are not being addressed <u>before</u> the land is reclassified," as <u>Kā Pa'akai</u> requires, and that the BLNR improperly delegated its duty to protect and preserve Native Hawaiian rights:

> 35.  UHH shall consult with the Kahu Kū Mauna Council and cultural practitioners to the extent feasible to plan for, and establish, an appropriate area on Mauna Kea, within the MKSR, to be used by native Hawaiians for religious and cultural purposes; provided that this condition shall not affect the timing of TMT construction or operation.
> . . . .
> 41.  Kahu Kū Mauna shall review policies concerning the construction and retention of personal or group shrines such as 'ahu, and recommend policies to OMKM and/or the BLNR as appropriate, within 18 months. . . .

This "improper delegation" argument stems from our holding in <u>Kā Pa'akai</u> that an agency cannot delegate its duties to a developer.  <u>Kā Pa'akai</u>, 94 Hawai'i at 50-51, 7 P.3d at 1087-88.  Again, it was not necessary to address the third <u>Kā Pa'akai</u>

---

(continued. . .)
> . . . .
> 34. Daytime activities at TMT will be minimized on up to four days per year, as identified by Kahu Kū Mauna;
> . . . .
> 36. UHH shall allow reasonable access to the area established under Condition 35 for the exercise of any native Hawaiian traditional and customary practices to the extent feasible, reasonable, and safe. The allocation of this area shall be in addition to all other cultural and access rights of native Hawaiians to other areas of Mauna Kea as provided by law or by other conditions set forth herein[.]

requirement.  In addition, although at first blush conditions 35 and 41 may appear to be delegations, they are not; they are outside and in addition to Kā Pa'akai requirements, and were imposed to ensure that Native Hawaiian practices in the Mauna Kea area will continue to be protected.

Thus, the BLNR discharged its Kā Pa'akai duties.

### 2. Whether the TMT Project violates religious exercise rights of Native Hawaiians protected by federal statutes.

Kihoi Appellants assert that the BLNR erred by not addressing the substantial burden and impact the TMT would have on their rights under the Free Exercise Clause of the First Amendment to the United States Constitution.  The BLNR Decision and Order, however, describes each of the Kihoi Appellants, then addresses each of their testimonies, their witnesses, and arguments.  The Kihoi Appellants also erroneously assert that the testimony of Appellant Kanaele was never addressed, as his testimony was addressed in BLNR Decision and Order FOFs 21, 250, 794, and 886.

Kihoi Appellants also cite to The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000b et seq. ("RFRA"), which they allege requires application of a strict scrutiny standard when determining whether the Free Exercise Clause has been violated. In State v. Sunderland, 115 Hawai'i 396, 403, 168 P.3d 526, 533 (2007), however, we "already [took] note of the fact that the

41

United States Supreme Court, in [City of Boerne v. Flores, 521 U.S. 507 (1997)], invalidated RFRA insofar as it 'exceeded the enumerated powers of Congress and was, therefore, unconstitutional.' . . . As a result, RFRA is inoperative as to the individual states." Thus, RFRA applies only to the federal government, and does not apply to the TMT Project. Sunderland, 115 Hawai'i at 403 n.9, 168 P.3d at 533 n.9.

Kihoi Appellants also argue that the land use provisions of the "Religious Land Use and Institutionalized Persons Act of 2000" ("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., protect individuals, houses of worship, and other religious institutions from discrimination in zoning and landmarking laws. Kihoi Appellants did not raise any argument under that statute during the contested case proceeding. In any event, as held by the Ninth Circuit Court of Appeals in Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1077 (9th Cir. 2008) RLUIPA "applies only to government land-use regulations of private land – such as zoning laws – not to the government's management of its own land."

Therefore, this point of error is without merit.

3.    **Whether the Hearing Officer should have allowed briefing and a hearing on a motion to dismiss based on a request to disqualify UHH as applicant based on its alleged hostility toward the traditional Hawaiian faith.**

Appellant Temple of Lono alleges that the Hearing Officer failed to allow briefing and a hearing on its attempts to have UHH disqualified as the applicant for the CDUA based on statements UHH made in a pre-hearing memorandum.  The issue arises out of statements contained in UHH's August 1, 2016 memorandum in opposition to Appellant Temple of Lono's motion before the Hearing Officer seeking summary judgment on two claims regarding its religious practices, that (1) "the summit of Mauna a Wākea is a sacred site of special significance in the traditional Hawaiian faith" and that (2) "the traditional Hawaiian faith is still practiced."

The Temple's opening brief does not quote the allegedly offending language, but asserts that it is in a section entitled "Policy Considerations for Motion," in which UHH included the following statements:

> The problem with fundamentalism in religion – **any religion** – is its intolerance and inability to compromise.  Fundamentalist religion when confronted with a conflict between cooperation and conformity to doctrine invariably chooses the latter, regardless of the harm it brings to the society of which it is a part.  The Temple wants a religious servitude over all of Mauna Kea, for the purpose of advancing its own religious agenda.
>     The Temple's religious fundamentalism calls into play the tension between the establishment clause and the free exercise clause.  The Temple wants **full expansion** of the free exercise clause regarding Mauna Kea. . . .  In short, the Temple cannot use this proceeding to obtain a religious servitude over Mauna Kea, as part of advancing the Temple's fundamentalist agenda.

43

Appellant Temple of Lono challenged this language as an <u>ad</u> <u>hominem</u>[20] attack.  The Hearing Officer denied various attempts to have UHH disqualified as the CDUA applicant based on this language in its memorandum.

UHH argues that the offending language was not an attack on Appellant Temple of Lono, but rather was a response to the Temple's argument that because Mauna Kea is viewed as sacred and is of special significance to its faith, the TMT Project could not be constructed there.  UHH indicates that while it believes Mauna Kea could accommodate both the TMT Project and traditional Native Hawaiian religion, the Temple, rejects that sharing of Mauna Kea. It asserts that the language in question argued that such an absolutist position amounted to seeking a religious servitude over the mountain, which would itself run afoul of the establishment clauses of both the federal and state constitutions.

Despite UHH's reasoning, the tenor of the language in its memorandum was unnecessary.  Neither the Hearing Officer nor the BLNR were required to disqualify UHH as the CDUA applicant based on this language, and this argument is without merit.[21]

---

[20]    Black's Law Dictionary 48 (10th ed. 2014) defines "ad hominem" as "[a]ppealing to personal prejudices rather than to reason; attacking an opponent's character, esp. in lieu of a rational response to the opponent's stand or statement. . . ."

[21]    Appellant Temple of Lono also argued in Point of Error B(5) that the Hearing Officer should have allowed briefing and a hearing on a motion to
(continued. . .)

4.    **Whether the Hearing Officer should have excluded challenges to the legal status of the State of Hawaiʻi and its ownership of Mauna Kea as well as the existence of the Kingdom of Hawaiʻi.**

Appellant Fergerstrom asserts that the summit of Mauna Kea, as well as the ahupuaʻa of Kaʻohe in the District of Hāmākua are lands still held by the Hawaiian Kingdom. He alleges that the Hearing Officer wrongfully denied him his right to present expert testimony from Professor Williamson Chang of the University of Hawaiʻi William S. Richardson School of Law. Professor Chang proposed to testify that the State of Hawaiʻi does not exist as a matter of United States Constitutional law because annexation through a Joint Resolution of Congress rather than through a Treaty of Annexation was ineffective.[22]

The United States Supreme Court's interpretations of the United States Constitution are, however, binding throughout the

_____

(continued. . .)
dismiss based on violation of the desecration statute of the Hawaiʻi Penal Code, HRS § 711-1107 (2014).  The Hearing Officer considered the motion and properly denied it based on the grounds that:  (1) the agency lacked jurisdiction to adjudicate alleged violations of the Penal Code; and (2) the Temple failed to carry its summary judgment motion burden.  Thus, this point of error is without merit.

[22]    For a historical perspective, see Congress's Joint Resolution to Acknowledge the 100th Anniversary of the January 17, 1893 Overthrow of the Kingdom of Hawaii signed into law by then-President Bill Clinton on November 23, 1993 as Public Law No. 103-150, 107 Stat. 1510 (1993), quoted in full in Office of Hawaiian Affairs v. Housing and Community Development Corp. of Hawaii, 117 Hawaiʻi 174, 183-86, 177 P.3d 884, 893-96 (2008).  For additional Native Hawaiian perspectives, see Volume 39, Number 2 (Summer 2017) of the University of Hawaiʻi Law Review.

United States.  As pointed out by Professor Jon M. Van Dyke in

his book WHO OWNS THE CROWN LANDS OF HAWAI'I, at page 212 note 86:

> The U.S. Supreme Court gave tacit recognition to the
> legitimacy of the annexations of Texas and Hawai'i by joint
> resolution, when it said in De Lima v. Bidwell, 182 U.S. 1,
> 196 (1901), that "territory thus acquired [by conquest or
> treaty] is acquired as absolutely as if the annexation were
> made, as in the case of Texas and Hawaii, by an act of
> Congress."  See also Texas v. White, 74 U.S. (7 Wall.) 700
> (1868), stating that Texas had been properly admitted as a
> state in the United States.

In other words, like Hawai'i, Texas was also admitted as a state

through a joint resolution of Congress.  The United States

Supreme Court has thus indicated that the process by which

Hawai'i was incorporated into the United States was lawful and

binding, and we are bound by this determination.  In addition,

as we stated in State v. Kaulia, "[W]e reaffirm that '[w]hatever

may be said regarding the lawfulness' of its origins, 'the State

of Hawai'i . . . is now a lawful government.'"  128 Hawai'i 479,

487, 192 P.3d 377, 385 (2013) (citing State v. Fergerstrom, 106

Hawai'i 43, 55, 101 P.3d 652, 664 (App. 2004)).

The BLNR is bound by the United States Supreme Court's and

this court's precedents regarding the legal status of the State

of Hawai'i.  Therefore, the Hearing Officer did not err by

excluding the proposed evidence.

46

C.   **Public Trust and Land Use Issues**

1.   **Whether TMT Project violates Article XI, Section 1 of the Hawai'i Constitution and public trust principles.**

Article XI, Section 1 Hawai'i Constitution provides as follows:

> For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>      All public natural resources are held in trust by the State for the benefit of the people.

In In re Water use Permit Applications, 94 Hawaii 97, 9 P.3d 409 (2000) ("Waiāhole I"), in ruling that under Article XI, Sections 1 and 7 and the sovereign reservation, water is a public trust resource, we stated that "[w]e need not define the full extent of article XI, section 1's reference to 'all public resources' at this juncture." Waiāhole I, 94 Hawai'i at 133, 9 P.3d at 445. Since then, "[t]his court has never precisely demarcated the dimensions of the public trust doctrine as incorporated in Article XI, Section 1." See Mauna Kea I, 136 Hawai'i at 404, 363 P.3d at 252 (Pollack, J., concurring).

The plain language of Article XI, Section 1 provides that all public natural resources, including land, are held in trust by the State for the benefit of the people. We therefore now

hold that conservation district lands owned by the State,[23] such as the lands in the summit area of Mauna Kea, are public resources held in trust for the benefit of the people pursuant to Article XI, Section 1.[24] The plain language of Article XI, Section 1 further requires a balancing between the requirements of conservation and protection of public natural resources, on the one hand, and the development and utilization of these resources on the other in a manner consistent with their conservation. We have also stated that the balancing must be "consistent with . . . conservation [of these resources] and in furtherance of the self-sufficiency of the State." Waiāhole I, 94 Hawai'i at 139, 9 P.3d at 451. We have also stated Article XI, Section 1, requires the state both to "protect" natural resources and to promote their "use and development," consistent with the conservation of the natural resources. Id. We have also indicated that any balancing between public and private purposes must begin with a presumption in favor of public use,

---

[23] HRS § 183C-2 (2011) provides that the "`[c]onservation district' means those lands within the various counties of the State bounded by the conservation district line, as established under provisions of Act 187, Session Laws of Hawaii 1961, and Act 205, Session Laws of Hawaii 1963, or future amendments thereto."

[24] Other types of public lands (and whether or how public trust principles should apply to such lands) are not before us at this time.

access and enjoyment. <u>Waiāhole I</u>, 94 Hawai'i at 142, 9 P.3d at 454.[25]

In our de novo determination of whether these requirements of Article XI, Section 1 have been met, we consider relevant findings in the BLNR Decision and Order.[26]

---

[25]    We note that Appellants only assert a violation of public trust principles under Article XI, Section 1, and although Appellees raise arguments based on permissible uses of ceded lands pursuant to Section 5(f) of the Admission Act of 1959, Appellants have not alleged a violation of the ceded lands trust.  Section 5(f) ceded lands trust purposes are "[1] the support of the public schools and [2] other public educational institutions, [3] the betterment of the conditions of native Hawaiians*,* as defined in the Hawaiian Homes Commission Act, 1920, as amended, [4] the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and [5] the provision of lands for public use."  <u>Office of Hawaiian Affairs v. State</u>, 96 Hawai'i 388, 390, 31 P.3d 901, 903 (2001).

Ceded lands are also subject to Article XII, Section 4 of the Hawai'i Constitution, which provides that "[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act and pursuant to Article XVI, Section 7, of the State Constitution, excluding therefrom lands defined as 'available lands' by Section 203 of the Hawaiian Homes Commission Act, 1920, as amended, shall be held by the State as a public trust for native Hawaiians and the general public."  Article XVI, Section 7 in turn provides that "[a]ny trust provisions which the Congress shall impose, upon the admission of this State, in respect of the lands patented to the State by the United States or the proceeds and income therefrom, shall be complied with by appropriate legislation.  Such legislation shall not diminish or limit the benefits of native Hawaiians under Section 4 of Article XII."

The BLNR also cites to Article X, Section 5 of the Hawai'i Constitution, which creates the University and gives it title to all real property conveyed to it, to "be held in public trust for its purposes, to be administered and disposed of as provided by law."

These other constitutional provisions and effectuating legislation are not at issue in this case, but they may play a part in defining public trust principles under Article XI, Section 1 with regard to conservation district lands owned by the State.  Therefore, with respect to the Article XI, Section 1 public trust as to conservation lands, we do not wholesale adopt our precedent setting out public trust principles as applied to the state water resources trust.  <u>See</u> <u>Waiāhole I</u>, 94 Hawai'i at 133-44, 9 P.3d at 445-56, and its progeny.  Rather the dimensions of this trust remain to be further demarcated.

[26]    We do not address Justice Pollack's suggested analytical framework for addressing whether an agency is in compliance with its public trust

(continued. . .)

49

With respect to the requirements of conservation and protection of public natural resources, the BLNR's finding that the TMT Project will not cause substantial adverse impact to geologic sites is not challenged.  The TMT Project does not involve the irrevocable transfer of public land to a private party.  The TMT is to be decommissioned at the end of its anticipated 50 year useful life or at the end of the lease,[27] whichever comes first, pursuant to the Decommissioning Plan, and the land must then be restored.  The BLNR also imposed as conditions of the CDUP various measures that will help protect the land in the area, such as requiring compliance with all laws as well as representations made regarding measures designed to reduce the negative impact of the project, requiring funding of the re-naturalization of the closed access road on Pu'u Poli'ahu, and permanent decommissioning of three telescopes as soon as possible and two additional telescopes by December 31, 2033.[28]

With respect to the development and utilization of the land consistent with its conservation and in furtherance of the self-sufficiency of the State, with a presumption in favor of public

(continued. . .)
obligations because, as he states, the BLNR has fulfilled its public trust obligations in any event. See Section IV of the Opinion of Pollack, J., Concurring in Part and Concurring in Judgment.

[27]    The current General Lease expires on December 31, 2033.

[28]    See the additional discussion in Section V(C)(2)(a) below regarding decommissioning, including funding for decommissioning.

use, access, and enjoyment, Appellants point out that in

Waiāhole I, we upheld the exercise of Native Hawaiian

traditional and customary rights as a public trust purpose.

Waiāhole I, 94 Hawaiʻi at 137, 9 P.3d at 449.  Appellants assert

that the use by Native Hawaiians of the land proposed to be used

for TMT is a public use while use by TMT users is a private use.

As discussed earlier, however, there was no actual evidence

of use of the TMT Observatory site and Access Way area by Native

Hawaiian practitioners.  Furthermore, in general, astronomy and

Native Hawaiian uses on Mauna Kea have co-existed for many years

and the TMT Project will not curtail or restrict Native Hawaiian

uses.  In addition, the TMT is an advanced world-class telescope

designed to investigate and answer some of the most fundamental

questions regarding our universe, including the formation of

stars and galaxies after the Big Bang and how the universe

evolved to its present form.  Native Hawaiians will also be

included in other direct benefits from the TMT.  Use of the land

by TMT will result in a substantial community benefits package,

which has already provided over $2.5 million for grants and

scholarships for STEM education benefitting Hawaiʻi students.

The package also includes an additional commitment to provide $1

million annually for this program.  The TMT Project will also

result in a workforce pipeline program that will lead to a pool

of local workers trained in science, engineering, and technical

positions available for employment in well paid occupations. TIO will pay sublease rent to the University, the first telescope developer on Mauna Kea to do so, which will be used for the management of Mauna Kea through the Mauna Kea Special Management Fund, administered by OMKM.  Thus, use of the land by TMT is consistent with conservation and in furtherance of the self-sufficiency of the State.

We therefore hold that the TMT comports with Article XI, Section 1 public trust principles and that the BLNR met its duties as trustee under the Article XI, Section 1 public land trust[29] through its Decision and Order.[30]

---

[29]  We held in Mauna Kea I that an agency must perform its functions in a manner that fulfills the State's affirmative obligations under the Hawai'i constitution.  Mauna Kea I, 136 Hawai'i at 414, 363 P.3d at 262 (Pollack, J., concurring, in which Wilson, J., joined, and McKenna, J., joined as to Part IV).  In addition, "[t]he duties imposed upon the state are the duties of a trustee and not simply the duties of a good business manager." Waiāhole I, 94 Hawai'i at 143, 9 P.3d at 455 (citation omitted).  Therefore, in performing its duties, the role of an agency is not merely to be a passive actor or a neutral umpire, and its duties are not fulfilled simply by providing a level playing field for the parties.  Mauna Kea I, 136 Hawai'i at 414, 363 P.3d at 262  (Pollack, J., concurring, in which Wilson, J., joined, and McKenna, J., joined as to Part IV.)

[30]  FOF 360 states that "TIO has already received substantial funds and will undertake additional fundraising efforts once a decision has been made as to the project approval."  Although the BLNR addressed funding of decommissioning after completion, it is unclear whether other than an agreement from TIO to perform, the BLNR has adequately ensured that buildings or equipment will not be left behind and the areas used by TMT will be restored in the event full funding is not obtained for completion of construction or insufficient funds for decommissioning are available.  Its duties as trustee require that it do so.  The BLNR has discretion under Special Condition 43 to impose "[o]ther terms and conditions" on the CDUP.  Therefore, the BLNR should ensure that the areas used by TMT will be restored to their natural states at no cost to the State, whether through requiring an appropriate performance bond or through imposing funding and/or other requirements.

   **2.    Whether the conditions of HAR § 13-5-30(c) for
          issuance of a CDUP were satisfied.**

   Pursuant to HAR § 13-5-24(c)(4) (1994), "astronomy
facilities under a management plan approved simultaneously with
the [Board] permit" is a permissible land use in the resource
subzone, within which the MKSR is situated.  Before granting a
CDUP for any proposed land use, however, the BLNR must consider
the eight criteria of HAR § 13-5-30(c) in evaluating the merits
of the specific proposed use.  HAR § 13-5-30(c) provides:

> (c) In evaluating the merits of a proposed land use, the
> department or board shall apply the following criteria:
>
> (1) The proposed land use is consistent with the
> purpose of the conservation district;
> (2) The proposed land use is consistent with the
> objectives of the subzone of the land on which the
> use will occur;
> (3) The proposed land use complies with provisions
> and guidelines contained in chapter 205A, HRS,
> entitled "Coastal Zone Management", where applicable;
> (4) The proposed land use will not cause substantial
> adverse impact to existing natural resources within
> the surrounding area, community, or region;
> (5) The proposed land use, including buildings,
> structures, and facilities, shall be compatible with
> the locality and surrounding areas, appropriate to
> the physical conditions and capabilities of the
> specific parcel or parcels;
> (6) The existing physical and environmental aspects
> of the land, such as natural beauty and open space
> characteristics, will be preserved or improved upon,
> whichever is applicable;
> (7) Subdivision of land will not be utilized to
> increase the intensity of land uses in the
> conservation district; and
> (8) The proposed land use will not be materially
> detrimental to the public health, safety, and
> welfare.
>
> The applicant shall have the burden of demonstrating that a
> proposed land use is consistent with the above criteria.

   The BLNR made extensive FOFs and COLs regarding each of the
eight criteria.  See BLNR Decision and Order, pp. 77 to 189, FOF

53

429-1040, pp. 213-37, COL 121-321.  Appellants generally allege that the BLNR's findings in this regard are erroneous, but their generalized assertions relate only to subsections (4) through (6), as discussed below.

### a.    HAR § 13-5-30(c)(4)

HAR § 13-5-30(c)(4) prohibits a "proposed land use" if it will "cause substantial adverse impact to existing natural resources within the surrounding area, community, or region." HAR § 13-5-2 (1994) defines "natural resources" to mean "resources such as plants, aquatic life and wildlife, cultural, historic, recreational, geologic, and archeological sites, scenic areas, ecologically significant areas, watersheds, and minerals."[31]

The BLNR concluded that the TMT Project will not cause substantial adverse impacts to existing natural resources within

---

[30]   In Kā Pa'akai, we declined to define "cultural resources" stating, "'[c]ultural resources' is a broad category, of which native Hawaiian rights is only one subset.  In other words, we do not suggest that the statutory term, 'cultural resources' is synonymous with the constitutional term, customary and traditional native Hawaiian rights."  Kā Pa'akai, 94 Hawai'i at 47 n.27, 7 P.3d at 1084 n.27.  Although not specifically asserted by Appellants as a point of error, the BLNR suggested in COL 203 that cultural practices are not cultural resources protected by HAR § 13-5-30(c)(4), stating "[u]nder the definition of 'Natural resource' in HAR § 13-5-2, cultural, historical, and archaeological 'sites' are 'natural resources'; but cultural practices are not necessarily." As indicated in footnote 17, however, the DLNR had included Native Hawaiian "cultural practices" within its assessment of "natural resources," despite the University's incorrect position that "cultural practices" are not "natural resources."  In addition, the BLNR's HAR § 13-5-30(c)(4) analysis contains numerous references to its assessment of the impact of the TMT Project on cultural practices.  See, e.g., COLs 198, 199, 205-10, 212, and 215.  Therefore, any error in COL 203 is harmless.

the surrounding area, community, or region.  Appellants agree with the BLNR's conclusion that the cumulative effects of astronomical development and other uses in the summit area of Mauna Kea, even without the TMT, have already resulted in substantial, significant and adverse impacts, but challenge the BLNR's conclusion that, therefore, the impacts on natural resources within the Astronomy Precinct of the MKSR would be substantially the same even in the absence of the TMT Project.

Similar to the Advanced Technology Solar Telescope ("ATST") atop Haleakalā, Kilakila III, 138 Hawaiʻi at 402-05, 382 P.3d at 214-17, it is undisputed that even without the TMT, the cumulative effect of astronomical development and other uses in the summit area of Mauna Kea have resulted in impacts that are substantial, significant and adverse.  We opined in Kilakila III, however, that the "BLNR does not have license to endlessly approve permits for construction in conservation districts, based purely on the rationale that every additional facility is purely incremental. It cannot be the case that the presence of one facility necessarily renders all additional facilities as an 'incremental' addition." Kilakila III, 138 Hawaiʻi at 404, 382 P.3d at 216.

As discussed earlier, there was no evidence of use of the TMT Observatory site and Access Way area for Native Hawaiian cultural practices.  The BLNR asserts that in determining

whether the TMT Project would have a substantial adverse impact on natural resources within the broader surrounding area, community, or region, as prohibited by HAR § 13-5-30(c)(4), it properly considered a host of measures designed to address environmental and cultural impacts of the TMT Project.[32] These measures included project level measures, as well as the University's commitment to decommissioning the CSO, Hōkū Keʻa, and the UKIRT telescopes by the time TMT is operational.

Appellants assert that these measures are insufficient and that, in any event, there is no commitment to restore the abandoned Poliʻahu Road and to decommission three telescopes. FOF 344 indicates, however, that TIO committed to restore the closed access road on Puʻu Poliʻahu in accordance with plans already approved by the DLNR. Also, the University committed to the decommissioning and restoration of the CSO, Hōkū Keʻa, and the

---

[32]    In its FOF 522, the BLNR listed a number of measures designed to reduce or offset the negative impact of the TMT project, including:  (1) site selection and infrastructure design to lessen the visual, cultural and environmental impact; (2) TMT Access Way design to reduce impact; (3) implementing a cultural and natural resources training program; (4) developing educational exhibits; (5) restoring Puʻu Poliʻahu; (6) providing a sense of place within the TMT facilities; (7) providing financial contributions to support cultural programs; (8) implementing specific cultural and community outreach efforts; (9) implementing cultural observance days; (10) continuing consultation with the State Historic Preservation Division and Kahu Kū Mauna Council regarding  protocols for the relocation of the modern shrine (11) working with OMKM to develop and implement a wēkiu bug habitat restoration study (12) developing and implementing an invasive species prevention and control program; and (13) continuing consultations with cultural practitioners.

UKIRT telescopes by the time TMT is operational.  Moreover,

Special Conditions 10 and 11 for the CDUP provide:

> 10. The University will decommission three telescopes permanently, as soon as reasonably possible, and no new observatories will be constructed on those sites. This commitment will be legally binding on the University and shall be included in any lease renewal or extension proposed by the University for Mauna Kea;
>
> 11. Notwithstanding any lease renewal or extension, consistent with the Decommissioning Plan, at least two additional facilities will be permanently decommissioned by December 31, 2033, including the Very Long Baseline Array antenna and at least one additional observatory.[33]

With respect to the decommissioning commitment and

requirement, the University owns four telescopes on Mauna Kea:

UKIRT, JCMT, Hōkū Keʻa, and the University 2.2-meter Telescope.

The University operates the University 2.2-meter Telescope and

Hōkū Keʻa; UKIRT and JCMT are operated by other organizations.

CSO and Hōkū Keʻa have already submitted their notices of intent

to decommission.  The University has also committed to

decommission UKIRT by the time TMT becomes operational.  In

addition, Special Condition 11 requires that the Very Long

Baseline Array antenna and at least one additional observatory

be decommissioned by December 31, 2033.

With respect to funding for decommissioning, in January

2010, OMKM promulgated a Decommissioning Plan as a Sub-Plan of

---

[33]    Although Special Condition 11 lacks the language included in Special Condition 10 specifying that it is a legally binding commitment, we interpret it and the other conditions included in the BLNR's Decision and Order to be similarly binding.

the Mauna Kea Comprehensive Management Plan.  The Decommissioning Plan calls for all new telescopes and existing telescopes that renegotiate their subleases to develop decommissioning funding plans to provide assurances of funds to finance the removal of their facilities and restore sites when the time to decommission arrives.  The CSO decommissioning will be performed under the Decommissioning Plan.  TIO has also committed to decommissioning the TMT under the Decommissioning Plan.  Its funding plan calls for depositing a million dollars per year, with adjustments for inflation, commencing upon observatory operation for the 50-year useful life of the TMT.

The University is responsible for funding and executing the decommissioning of its own facilities.  Before the transfer of ownership of the UKIRT and JCMT facilities to itself, the University secured $2.5 million for each telescope from the United Kingdom to defray the anticipated costs of decommissioning those telescopes.

Thus, contrary to Appellants' assertion, there are commitments to restore the abandoned Poli'ahu Road and to decommission three telescopes by the time TMT is operational. There is also a requirement to decommission two additional telescopes by December 31, 2033, a commitment to not seek any additional telescope sites to replace the five telescopes that

will be removed, and a plan for decommissioning other telescopes, including the TMT.

It was appropriate for the BLNR to consider these measures in its HAR § 13-5-30(c)(4) analysis.  Kilakila III, 138 Hawai'i at 404-05, 382 P.3d at 216-17; Morimoto v. Bd. of Land & Natural Res., 107 Hawai'i 296, 303, 113 P.3d 172, 179 (2005). **[270:41]**

The BLNR also recognized that "[t]he incremental nature of a project's impacts, standing alone, cannot endlessly justify development within an existing developed area[,]" but found that, "in this case, the TMT Project's compliance with all applicable rules, regulations, and requirements, the Master Plan, CMP, sub-plans, and the TMT Management Plan, along with the mitigation measures committed to in the TMT Final EIS, CDUA, and TMT Management Plan, demonstrate that the TMT Project will not cause substantial adverse impact to the existing natural resources within the surrounding area, community, or region under HAR § 13-5-30(c)(4)."  Because (1) the TMT will not cause substantial adverse impact to existing plants, aquatic life and wildlife, cultural, historic, and archaeological sites, minerals, recreational sites, geologic sites, scenic areas, ecologically significant areas, and watersheds, (2) mitigation measures of restoring the abandoned Poli'ahu Road and decommissioning five telescopes will be adopted, and (3)  other measures to lessen the impacts of the TMT will be adopted, the

BLNR did not clearly err in concluding that the TMT will not have a substantial adverse impact to existing natural resources within the surrounding area, community, or region, as prohibited by HAR § 13-5-30(c)(4).

### b.    HAR § 13-5-30(c)(5)

HAR § 13-5-30(c)(5) required the BLNR to evaluate whether "[t]he proposed land use, including buildings, structures, and facilities, [is] compatible with the locality and surrounding areas and appropriate to the physical conditions and capabilities of the specific parcel or parcels."  Appellants specifically challenge the BLNR's conclusion that TMT is "compatible with the locality and surrounding areas."  In this case, the BLNR analyzed the TMT for purposes of HAR § 13-5-30(c)(5) in the context of the 525-acre Astronomy Precinct of the MKSR.  In Kilakila III, we affirmed the BLNR's analysis of the ATST project within the Haleakalā High Altitude Observatory ("HO") site, a single, highly developed 18.166-acre area within a much larger conservation district.  Kilakila III, 138 Hawai'i at 405, 382 P.3d at 217.  Appellants argue that the area evaluated for impacts for the ATST on Haleakalā differs significantly from the 525-acre Mauna Kea Astronomy Precinct, which encompasses an area including the summit and Northern Plateau areas of Mauna Kea.

60

There do not appear to be any clear criteria as to how to determine what should constitute the appropriate "locality and surrounding areas."  Nonetheless, total deference to the BLNR's decision regarding the area to be evaluated would allow many of the HAR § 13-5-30(c) criteria to be circumvented through strategic delineation, and there accordingly must be a sound and rational basis for defining the relevant locale.

In this case, it is true that Astronomy Precinct is 525 acres, and much larger than the site evaluated in Kilakila III. Under the MKSR Master Plan, however, astronomy development is restricted to a defined 150-acre portion of the 525-acre Astronomy Precinct.  The issue raised by Appellants regarding HAR § 13-5-30(c) is whether "[t]he proposed land use . . . [is] compatible with the locality and surrounding areas. . . ."  The BLNR noted that the proposed location of the TMT Project is a half mile from the summit area, in proximity to the eleven other previously developed facilities for astronomy within the Astronomy Project.  Therefore, on these facts, we cannot say that the BLNR erred in concluding that the TMT Project is "compatible with the locality and surrounding areas."

### c.  HAR § 13-5-30(c)(6)

HAR § 13-5-30(c)(6) (1994) provides: "The existing physical and environmental aspects of the land, such as natural beauty

and open space characteristics, will be preserved or improved upon, whichever is applicable[.]"

Appellants allege this requirement was not met. The BLNR points out that, in Kilakila III, we upheld the BLNR's findings and conclusions with respect to § 13-5-30(c)(6) on the grounds that:

> BLNR noted that "[t]he ATST will not enhance the natural beauty or open space characteristics of the HO site." However, because "[t]he HO site contains various astronomy facilities, including support buildings, roads and parking lots[,]" and "the proposed ATST is similar to existing facilities," BLNR concluded that "[t]he ATST will be consistent with and will preserve the existing physical and environmental aspects of the land. . . ." Additionally, BLNR considered numerous mitigation commitments in the CDUA, which were designed to mitigate impacts on biological resources. . . . Therefore, similar to its analysis of HAR § 13-5-30(c)(4), BLNR articulated with "reasonable clarity" why the ATST would preserve the existing physical and environmental aspects of the land.

[266:22] They cite to Kilakila III, 138 Hawai'i at 407, 382 P.3d at 219.

The BLNR cites to various measures, including the removal of telescopes from the summit ridge, which will be taken to preserve the natural beauty and open space characteristics of the land. Furthermore, the University formally committed that this is the last new area of Mauna Kea where a telescope project would be sought. The BLNR's findings with respect to HAR § 13-5-30(c)(6) are not clearly erroneous.

Therefore, Appellants' allegations based HAR § 13-5-30(c) are without merit.

D.    **Other Procedural Issues**

1.    **Whether the original CDUA should have been stricken and a new CDUA required.**

MKAH Appellants argue the Hearing Officer erred when she denied their motion to strike the CDUA because TIO and TOC are different corporations.  They assert the CDUA "should have been stricken and a new application submitted" because the CDUA had been brought by UHH on behalf of TOC, not on behalf of TIO.

The sections of the Hawai'i Administrative Rules cited by the MKAH Appellants do not support their position.  HAR § 13-5-31 (1994) does not explicitly state who may apply for a permit; rather, it requires the signature of the landowner.  HAR § 13-5-31(a)(5).  HAR § 13-5-31(b) then allows "the State of Hawaii or government entity with management control over the parcel" to sign as landowner when the CDUA pertains to state or public land.  The rules do not require the CDUA applicant to submit a new application after a change in developers.[34]

Appellants assert they were not given an opportunity to comment on the actual entity for which the CDUP was ultimately intended.  Appellants had ample opportunity during the contested case hearing, however, to comment on TIO, challenge its

---

[34]    If a proposed project has changed significantly, however, it appears an amended application would be required to comport with due process requirements of adequate notice and an opportunity to be heard on the actual project.

63

participation by opposing its admission as a party, and cross-examine its witnesses.

Therefore, this point of error is without merit.

**2.    What the nature of the proceeding was below, and whether there is an appropriate record on appeal.**

Appellant Temple of Lono asserts that the manner in which the proceedings were handled after remand makes it unclear whether this was a new contested case or a resumption of the prior contested case.  It argues that if the remand was treated as initiation of a new contested case, then the process had to provide some means for people to qualify as parties by requesting a contested case, such as a public hearing, citing to HAR § 13-1-29 (2009).  It further asserts that after remand, the BLNR stated that the contested case was being "resumed" but also stated that "no chapter 92 public meeting was required to "start up" the contested case. It asserts that, after remand, the proceeding "ended up as a hybrid recognized nowhere in the rules."

Appellant Temple of Lono appears to misapprehend the difference between a "contested case" and a "contested case hearing."  "'Contested case' means a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing."  HRS § 91-1 (1993 & Supp. 2017).  In Mauna Kea I, we

vacated the judgment that followed the first contested case hearing and remanded the case for a new hearing without dismissing the contested case itself. 136 Hawai'i at 399, 363 P.3d at 247. Thus, in the contested case hearing after remand, just as in a new trial after remand, a new record on appeal is created based on admitted evidence.

The Hearing Officer therefore appropriately included in the record on appeal filings from the contested case up until the point in time that the CDUA was originally approved. She then continued the proceeding from that point, with filings and evidence from the second contested case hearing. This point of error is therefore without merit.

3. **Whether TIO and PUEO should have been admitted as parties.**

MKAH Appellants, Appellant Temple of Lono, and Appellant Fergerstrom assert the Hearing Officer and the BLNR erred by admitting TIO and PUEO as parties to the contested case hearing after our remand in Mauna Kea I. They assert TIO and PUEO's motions to intervene were not timely because they were filed after our remand, five and a half years after the February 25, 2011 board meeting at which the BLNR approved the CDUA and ordered that a contested case hearing be held.

As discussed in the previous section, we remanded for a new "contested case hearing," and did not require initiation of a

new "contested case."  Admitting interested parties to participate for the new contested case hearing on remand was consistent with the due process concerns of Mauna Kea I.  See id.  Also, HAR § 13-1-31(a) (2009) requires the decision maker to determine the parties "within a reasonable time following the ten-day period following the board meeting."  The "board meeting" in question is "the board meeting at which the subject matter of the request is scheduled for board disposition" identified in HAR § 13-1-29 (2009), which, in this case, was the February 25, 2011 board meeting.

HAR § 13-1-31(b) and (c) (2009), however, do not support Appellants' assertion that TIO and PUEO's applications were untimely.  Subsection (b) gave the Hearing Officer authority to admit parties based "upon timely application."  Subsection (c) gave the Hearing Officer discretion to admit parties "who can show a substantial interest in the matter" so long as "the requestor's participation [would] substantially assist the board in its decision making."

Although PUEO and TIO "were not admitted "at the 'same time' as the request for [the MKAH Appellants] on or about February 25, 2011 for a contested case hearing," there was no abuse of discretion or other error.  Although HAR § 13-1-31(d) (2009) states, "All persons with similar interests seeking to be admitted as parties shall be considered at the same time so far

66

as possible[,]" it does not preclude a later addition of parties.

Thus, the intervention of new parties after remand from this court was not erroneous.

**4.    Whether the Hearing Officer's scheduling of presentations by the parties violated Appellants' due process rights.**

This issue arises out of an August 23, 2016 procedural ruling by the Hearing Officer requiring all parties to simultaneously submit witness lists, their witnesses' written direct testimonies, exhibit lists, and exhibits, at a date to be set sometime in October 2016. Appellants argue that as the party seeking the CDUP, UHH had the burden of presenting a case sufficient to secure the BLNR's approval of the CDUA, citing to HAR § 13-1-35(k) (2009), which provides:

> The party initiating the proceeding and, in the case of proceedings on alleged violations of law, the department, shall have the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The quantum of proof shall be a preponderance of the evidence.

They assert that opponents have no burden of proof and should not have been required to put on their case simultaneously with UHH. They further assert that requiring them to prepare their case without seeing UHH's case violated their due process rights.

The Hearing Officer has discretion to determine hearing procedures pursuant to HAR § 13-1-32(b) and (c) (2009), but it

67

appears that there was an abuse of that discretion.  As Appellants argue, UHH had the burden, and even if exhibit lists and exhibits were properly ordered to be simultaneously submitted, the opponents of granting a permit for construction of the TMT should not have been required to submit their testimonies simultaneously with UHH.  Despite the Hearing Officer's initial deadline, however, Appellants were able to add new witnesses and exhibits throughout the evidentiary proceeding well past that deadline, and rebuttal witnesses were allowed upon a showing of good cause.  Moreover, Appellants do not allege any actual prejudice due to the initial simultaneous submission requirement.  Thus, Appellants were provided their due process right "to be heard at a meaningful time and in a meaningful manner[,]"  Sandy Beach Def. Fund v. City Council, 70 Hawaiʻi 361, 378, 773 P.2d 250, 261 (1989) (citations omitted).[35]

---

[35]    In Point of Error D(5), Appellant Temple of Lono asserts there was often significant time between the filing of its motions and issuance of rulings on those motions, and asserts eighteen motions were not decided or decided late.  Of the eighteen motions, all but one were filed after the July 18, 2016 motions deadline, and the Hearing Officer eventually ruled on all motions. In Point of Error D(6), the Temple alleges that the Hearing Officer refused to provide "reasoned explanations" for her rulings.  The record indicates that explanations were provided to the Temple for all of the rulings. Therefore, these points of error lack merit.

5.    **Whether the Hearing Officer improperly failed to provide required rulings and explanations for thousands of proposed findings of fact.**

Appellant Temple of Lono asserts the Hearing Officer failed to comply with the requirement to provide a ruling on each of its proposed FOFs.  It cites HRS § 91-12 (1993), which provides as below, with emphases added:

> <u>Decisions and orders.</u>  Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law.  <u>If any party to the proceeding has filed proposed findings of fact, the agency shall incorporate in its decision a ruling upon each proposed finding so presented.</u>  The agency shall notify the parties to the proceeding by delivering or mailing a certified copy of the decision and order and accompanying findings and conclusions within a reasonable time to each party or to the party's attorney of record.

The Hearing Officer's Proposed Findings of Fact, Conclusions of Law, Decision and Order stated in the Introduction section:

> Any proposed finding of fact submitted by the parties which is not specifically incorporated is rejected for one or more of the following reasons:
>
> -- They are repetitious or similar to the Hearing Officer's own findings of fact or conclusions of law or decision and order, and/or
>
> -- They are not supported by reliable and/or probative evidence, and/or
>
> -- They are in whole or in part not supported by and/or are contrary to the facts or law, and/or
>
> -- They are immaterial, superfluous, and/or irrelevant to the material facts, issues, and/or law of this case.

**[185:302]**

Appellant Temple of Lono alleges that without specific rulings on each proposed finding, a party is left to first

69

search out which proposed findings the Hearing Officer rejected. It asserts that the proposing party must engage in pure speculation as to which of the above possible reasons or combination of reasons a proposed finding had been rejected, and that this process does not provide a meaningful opportunity to file exceptions.

In Mitchell v. BWK Joint Venture, 57 Haw. 535, 540-43, 560 P.2d 1292, 1296-97 (1977), we held that HRS § 91-12 was not violated when a board rejected wholesale a number of proposed findings "for the reason that these findings of fact had been disapproved by the board or were repetitious of testimony which was already in evidence".  We also stated:

> The respondent offered 53 proposed findings, of which the Board accepted 20. It rejected the remaining proposed findings "because they are, in whole or in part, contrary to the facts or the law or because they are immaterial."  Such a statement indicated the Board's ruling with respect to its adoption or rejection of all 53 of the proposed findings, and **we see no objection to including all 53 rulings in one sentence instead of 53 separate sentences**.

Mitchell, 57 Haw. at 541-42, 560 P.2d at 1296-97(emphasis added).  In Application of Hawaiian Tel. Co., we also stated that "[i]t is a settled rule in administrative law that a separate ruling on each proposed finding filed by a party is not indispensable. . . . All that is required is that the agency incorporate its findings in its decision."  54 Haw. 663, 668, 513 P.2d 1376, 1379 (1973) (citation omitted).  Also, the ICA ruled in Outdoor Circle v. Harold K.L. Castle Tr. Estate, that

where an agency "made and incorporated reasonably clear findings" and "[b]y choosing those, it impliedly rejected all others," the agency did not violate HRS 91-12.  4 Haw. App. 633, 645, 675 P.2d 784, 792 (1983).  The ICA also ruled in <u>Survivors of Timothy Freitas, Dec. v. Pac. Contractors Co.</u>, that HRS § 91-12 does not require "a separate ruling on each proposed finding".  1 Haw. App. 77, 84, 613 P.2d 927, 932 (1980).  To the extent the Hearing Officer did not adopt the Temple of Lono's proposed findings, they were impliedly rejected on the merits.

Therefore, this point of error is also without merit.[36]

## VI.  Conclusion

Upon our careful review of the issues raised in these appeals as discussed above, we affirm the BLNR's September 27,

---

[36]     Finally, in Point of Error D(8), Appellant Temple of Lono asserts that because the new Hearing Officer knew that the BLNR had earlier approved the permit, there is a question of how the Hearing Officer "would be any less influenced by the premature approval of the permit than the hearing officer in the first proceeding."  In <u>Mauna Kea I</u>, however, we ordered that the permit issued in the first proceeding be vacated and the matter remanded to the BLNR "so that a contested case hearing can be conducted before [the BLNR] or a new hearing officer, or for other proceedings consistent with this opinion."  <u>Mauna Kea I</u>, 136 Hawai'i at 381, 399, 363 P.3d at 229, 247.  The Hearing Officer was therefore required to read the court's opinion, which details the previous procedural history.  If Appellant Temple of Lono's position was correct, there could never be a new contested hearing after remand if an agency or hearing officer was aware of the prior ruling that had been set aside; decisions of judges are also sometimes vacated and remanded to them for further proceedings consistent with an appellate court's decision.  Thus, this point of error is also without merit.

2017, Decision and Order authorizing issuance of a CDUP for the

TMT.

Richard Naiwieha Wurdeman          /s/ Mark E. Recktenwald
for appellants
Mauna Kea Anaina Hou,          /s/ Sabrina S. McKenna
Kealoha Pisciotta,
Clarence Kukauakahi          /s/ Richard W. Pollack
Ching, Flores-Case 'Ohana,
Deborah J. Ward, Paul K.          /s/ Jeannette H. Castagnetti
Neves, and Kahea:
The Hawaiian Environmental
Alliance



Gary Z. Zamber
for intervenor-appellants
Temple of Lono, Mehana
Kihoi, Joseph Kuali'i Camara,
Leina'ala Sleightholm,
Kalikolehua Kanaele,
Tiffnie Kakalia, Brannon
Kamahana Kealoha, Cindy
Freitas, and William Freitas

Intervenor-appellant
Harry Fergerstrom, pro se,
on the briefs

Clyde J. Wadsworth
(William J. Wynhoff, Kimberly
Tsumoto Guidry, Julie China,
and Kaliko'onalani D. Fernandes
with him on the briefs)
for appellees State of Hawai'i,
Board of Land and Natural Resources,
and Chairperson Suzanne D. Case

John P. Manaut, Ian L.
Sandison, Joyce W.Y.
Tam-Sugiyama and Lyndsay N.
McAneeley for appellee
University of Hawai'i at Hilo

Ross T. Shinyama and J. Douglas
Ing (Brian A. Kang and Summer H.
Kaiawe with them on the briefs)
for intervenor-appellee
TMT International Observatory LLC

Lincoln S.T. Ashida and Newton J.
Chu (Vaughn G.T. Cook with them on
the briefs) for intervenor-appellee
Perpetuating Unique
Educational Opportunities, Inc.