**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000841
27-JAN-2021
10:24 AM
Dkt. 111 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


E. KALANI FLORES, Plaintiff-Appellant,
v.
SUSAN BALLARD in her capacity as Chief of Police
of the City and County of Honolulu;
PAUL FERREIRA in his capacity as the Chief of Police
of the County of Hawaii Police Department;
TIVOLI FAAUMU in his capacity as Chief of Police
of Maui County, Defendants-Appellees,
and
JOHN DOES 1-100, JANE DOES 1-100, DOE CORPORATIONS 1-100,
DOE PARTNERSHIPS 1-100, DOE ENTITIES 1-100,
and RICHARD ROES 1-100, MARY ROES 1-100,
ROE CORPORATIONS 1-100, ROE PARTNERSHIPS 1-100,
ROE ENTITIES 1-100, Defendants


NO. CAAP-19-0000841


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CASE NO. 3CC191000190)

JANUARY 27, 2021

GINOZA, CHIEF JUDGE, HIRAOKA AND NAKASONE, JJ.


OPINION OF THE COURT BY HIRAOKA, J.

With one exception, each county in Hawai'i has its own police department.[1] This case presents the issue of whether the police chief of one county can utilize police officers from

---

[1] The County of Kalawao, commonly known as the Kalaupapa Settlement on the island of Moloka'i, is under the jurisdiction and control of the Hawai'i Department of Health. Hawaii Revised Statutes § 326-34.

another county to enforce the law in the chief's county.  We hold: **(1)** the temporary assignment of police officers from one county to another is authorized by Hawaii Revised Statutes (**HRS**) § 78-27 (2012); and **(2)** HRS Chapter 52D and the Hawaiʻi County Charter authorize the chief of the Hawaiʻi County Police Department (**HCPD**) to appoint and supervise police officers from other counties temporarily assigned to Hawaiʻi County.

## <u>BACKGROUND</u>

This case arises from the controversy surrounding the construction of the Thirty Meter Telescope (**TMT**) at the summit of Mauna Kea, located on Hawaiʻi Island.  Mauna Kea (<u>lit.</u>, white mountain) is the highest mountain in the state, rising 13,796 feet above sea level.  Mary Kawena Pukui, Samuel H. Elbert & Esther T. Moʻokini, <u>Place Names of Hawaiʻi</u> 148-49 (Univ. of Haw. Press 1976).  Almost all of the land above the 12,000-foot elevation comprises the Mauna Kea Science Reserve, which consists of a 10,763-acre cultural and natural preserve and a 525-acre Astronomy Precinct.  <u>In re Conservation Dist. Use Application (CDUA) HA-3568</u>, 143 Hawaiʻi 379, 385, 431 P.3d 752, 758 (2018), <u>as amended</u> (Nov. 5, 2018 & Nov. 30, 2018), <u>recon. granted in part</u>, <u>denied in part</u>, 143 Hawaiʻi 327, 430 P.3d 425 (Table) (2018), <u>and recon. denied sub nom.</u> <u>In re Contested Case Hearing re Conservation Dist. Use Application (CDUA) HA-3568</u>, 143 Hawaiʻi 328, 430 P.3d 426 (Table) (2018) (**In re TMT CDUA**).

The Hawaiʻi Board of Land and Natural Resources (**BLNR**) leased the Mauna Kea Science Reserve to the University of Hawaiʻi in 1968.  <u>Flores v. Bd. of Land & Nat. Res.</u>, 143 Hawaiʻi 114, 117, 424 P.3d 469, 472 (2018) (**Flores I**).  The lease allows the University to use the land "as a scientific complex, including . . . an observatory, and as a scientific reserve being more specifically a buffer zone to prevent the intrusion of activities inimical to said scientific complex."  <u>Id.</u>  As of mid-2010, 13 astronomical facilities were located on Mauna Kea.  <u>Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res.</u>, 136 Hawaiʻi 376, 381, 363 P.3d 224, 229 (2015).  According to the University, observatories

are attracted to Mauna Kea "principally because of the superb viewing conditions that its high-altitude/mid-oceanic location provides[.]" Id.

In 2014 the University asked for BLNR's consent to sublease a portion of the Mauna Kea Science Reserve to TMT International Observatory LLC for construction of the TMT. Flores I, 143 Hawai‘i at 116, 424 P.3d at 471. BLNR consented to the sublease on April 9, 2015. Id. at 118, 424 P.3d at 473. BLNR's consent was challenged. The Hawai‘i Supreme Court validated the consent in Flores I.

In September 2017, BLNR issued a conservation district use permit for the TMT. In re TMT CDUA, 143 Hawai‘i at 384, 431 P.3d at 757. The permit was challenged. In November 2018, the supreme court affirmed BLNR's issuance of the permit. Id. at 409, 431 P.3d at 782. Thus, construction of the TMT — which had been delayed for years by legal challenges to the sublease and to the conservation district use permit – was allowed to proceed.

At some point before July 16, 2019, a great number of people assembled at Pu‘u Huluhulu, near the road leading to the Mauna Kea summit. They gathered to protest construction of the TMT by, among other things, blocking access to construction equipment and vehicles. The large scale of the protest strained HCPD's resources. The chief of HCPD, Defendant-Appellee Paul Ferreira (**Chief Ferreira**), asked Defendants-Appellees Susan Ballard (Chief of the Honolulu Police Department (**HPD**)) (**Chief Ballard**) and Tivoli Faaumu (Chief of the Maui County Police Department (**MPD**)) (**Chief Faaumu**) to support HCPD operations relating to the TMT construction project.

On Tuesday, July 16, 2019, HPD and MPD officers arrived on Hawai‘i Island to provide the requested support. The next day Plaintiff-Appellant E. Kalani Flores (**Flores**) filed a "Complaint for Declaratory and Injunctive Relief" with the Circuit Court of the Third Circuit, challenging the presence and legal authority of non-Hawai‘i-County law enforcement personnel on Hawai‘i Island. Flores's complaint named Chief Ballard, Chief Faaumu, and Chief Ferreira (collectively, the **Chiefs of Police**) as defendants.

## PROCEDURAL HISTORY

### Complaint Allegations

Flores's complaint made the following allegations: Flores is a Native Hawaiian.[2]  He lives on Hawai'i Island.  He holds Mauna Kea — an important site for Native Hawaiians to conduct traditional and customary cultural practices — to be sacred.[3]  He has performed traditional Native Hawaiian ceremonies on Mauna Kea for a number of years.

On July 13, 2019, Flores and others assembled at Pu'u Huluhulu to express reverence for Mauna Kea and opposition to construction of the TMT.  Flores claims that the government prevented him and other members of the public from accessing Mauna Kea, while permitting telescope employees to travel to the summit.  As described by Flores's complaint, there "was a heated day of standoffs and negotiations between authorities and opponents of the Thirty Meter Telescope."  Although the day ended on "relatively peaceful terms," the news media reported on a statement issued by HPD:

> HPD officers will be going to Hawaii Island at the request of the Hawaii Police Department.  They will assist Hawaii police officers in keeping roadways clear for the movement of construction equipment and vehicles.

Flores's complaint alleged that HPD and MPD officers went to Hawai'i Island to exercise police power in violation of HRS § 52D-5:

> 43.  Defendants have violated HRS § 52D-5.
>
> 44.  Based upon the above, the Honolulu Police Officers assisting the Hawaii County Police as described

---

[2]  The term "Native Hawaiian" refers to one "whose ancestors were natives of the Hawaiian Islands prior to 1778, without regard to blood quantum[.]"  In re TMT CDUA, 143 Hawai'i at 384 n.1, 431 P.3d at 757 n.1 (citations omitted).

[3]  In Mauna Kea Anaina Hou, the Hawai'i Supreme Court effectively recognized that the interest of Native Hawaiians in pursing traditional and customary cultural practices on Mauna Kea constitutes a property interest for purposes of triggering constitutional due process protections.  Flores I, 143 Hawai'i at 126, 424 P.3d at 481.

above have no lawful authority <u>as police officers</u> on Hawaiʻi Island. The same is true of Maui County Police officers.

45. Thus, Defendants, and all those acting under the color of Defendants' authority, lack the same authority that Hawaii County Police officers have on Hawaii [sic] Island to:

a. Make arrests

b. Investigate; and

c. Conduct traffic control

and any other "police" related business.

. . . .

49. In addition to the apparent police activity in contradiction of HRS §54D-5 [sic] as noted above, there is potential that the "off island" county police officers [sic] police presence will create confusion and unrest as ordinary citizens will question said officers' authority.

Flores sought a judgment declaring that the Chiefs of Police failed to comply with HRS § 52D-5, a temporary restraining order, and preliminary and permanent injunctions prohibiting the Chiefs of Police from violating the statute.

### **Motion to Dismiss and Joinders**

Chief Ballard filed a motion to dismiss Flores's complaint (**MTD**) under Rule 12(b)(6) of the Hawaiʻi Rules of Civil Procedure (**HRCP**).[4] She argued: (1) there is no private right of action for alleged violation of HRS § 52D-5; and (2) Flores's claim was moot because HPD officers were no longer on Hawaiʻi Island for any purpose relating to the TMT.

Chief Faaumu joined in Chief Ballard's MTD. He agreed with the no-private-right-of-action argument, and that Flores's claim was moot because MPD officers were no longer on Hawaiʻi Island for any purpose relating to the TMT.

---

[4] HRCP Rule 12 provides, in relevant part:

**(b) How presented.** . . . [T]he following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted[.]

Chief Ferreira also filed a joinder.  He agreed with the no-private-right-of-action argument, but took no position on the mootness argument because it did not apply to him as Chief of HCPD.

### Flores's Opposition

Flores filed a memorandum in opposition to Chief Ballard's MTD.  He argued: (1) there was an implicit or implied private right of action for violation of HRS § 52D-5; and (2) exceptions to the mootness doctrine applied.  Attached to the memorandum were declarations by Flores and by Flores's counsel, and eight exhibits.

### Chief Ballard's Reply

Chief Ballard filed a reply memorandum.  She objected to the declarations and exhibits submitted by Flores.  She also made the new argument that HRS § 52D-5 was not triggered at all, because HRS § 78-27 authorized the actions taken by HPD.

### Flores's Supplemental Filing

Flores filed an ex parte motion for leave to file a supplemental declaration and three additional exhibits in opposition to Chief Ballard's MTD, copies of which were appended to the ex parte motion.  The circuit court granted Flores's ex parte motion by order entered on September 19, 2019.

### Hearing, Order, and Judgment

Chief Ballard's MTD and the other chiefs' joinders were heard on September 20, 2019.[5]  Flores responded to the argument about HRS § 78-27 raised in Chief Ballard's reply memorandum.  After hearing argument, the circuit court ruled:

> So the Court concludes that there is no private right of action pursuant to HRS Section 52D-5.  Therefore, the motion to dismiss is granted.

---

[5]    The Honorable Henry T. Nakamoto presided.

The circuit court did not rule on Chief Ballard's objections to Flores's original declarations and exhibits.  None of the Chiefs of Police objected to the declaration and exhibits attached to Flores's ex parte motion to supplement.

On November 12, 2019, the circuit court entered its "Order Granting Defendant Susan Ballard's Motion to Dismiss" (**Order Granting MTD**).  The Order Granting MTD stated, in relevant part:

> 4.    The Court concludes, accordingly, that there is no private right of action pursuant to Haw. Rev. Stat. § 52D-5.

The Order Granting MTD did not contain a ruling on Chief Ballard's evidentiary objections or otherwise exclude the declarations or exhibits presented by Flores.

Also on November 12, 2019, the circuit court entered a **Judgment** in favor of the Chiefs of Police and against Flores. Flores filed this appeal.  We affirm, but for reasons other than those stated by the circuit court.

## STANDARDS OF REVIEW

### Motion to Dismiss Converted to Motion for Summary Judgment

A circuit court's order granting an HRCP Rule 12(b)(6) motion to dismiss is reviewed de novo, using the same standard applied by the circuit court:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [their] claim that would entitle [them] to relief. The appellate court must therefore view a plaintiff's complaint in a light most favorable to [them] in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing a circuit court's order dismissing a complaint the appellate court's consideration is strictly limited to the allegations of the complaint, and the appellate court must deem those allegations to be true.

Bank of Am., N.A. v. Reyes-Toledo, 143 Hawai'i 249, 256-57, 428 P.3d 761, 768-69 (2018) (cleaned up)[6].

In this case, however, Flores opposed Chief Ballard's MTD by presenting matters outside the pleadings. Under such circumstances HRCP Rule 12(b) provides, in relevant part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The circuit court did not exclude the declarations or exhibits presented by Flores. Accordingly, we apply the standard of review applicable to a motion for summary judgment under HRCP Rule 56.

The grant or denial of summary judgment is reviewed de novo. Nozawa v. Operating Engineers Local Union No. 3, 142 Hawai'i 331, 338, 418 P.3d 1187, 1194 (2018). Summary judgment is appropriate if the pleadings, depositions, answers to inter-rogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Id. at 342, 418 P.3d at 1198. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. Id.

Chief Ballard did not submit declarations or exhibits with her reply memorandum, nor did she file her own motion for summary judgment. When a plaintiff converts a defendant's HRCP Rule 12(b)(6) motion to dismiss into a motion for summary judgment by presenting matters outside the pleadings that are not

---

[6] The "cleaned up" parenthetical tells readers that extraneous material (e.g., internal brackets, ellipses, quotation marks, citations, foot-note reference numbers, and changes in capitalization) was removed from a quotation for readability, and that none of it mattered for understanding the quotation or evaluating its weight. See Jack Metzler, Cleaning Up Quotations, 18 J. App. Prac. & Process 143, 147 (2017).

excluded by the circuit court — without filing a counter-motion for summary judgment — and the moving defendant submits no matters outside the pleadings in response, the court views the facts alleged in the complaint <u>and</u> the evidence presented by the plaintiff (and the inferences to be drawn therefrom) in the light most favorable to the plaintiff.  <u>Andrade v. County of Hawaiʻi</u>, 145 Hawaiʻi 265, 270, 451 P.3d 1, 6 (App. 2019).  "The court need not, however, accept conclusory allegations concerning the legal effect of the facts the party has alleged or presented."  <u>Id.</u> at 270 n.6, 451 P.3d at 6 n.6 (citation omitted).  "When an assertion in an affidavit expresses an inference without setting forth the underlying facts on which the conclusion is based or states a conclusion that is not reasonably drawn from the underlying facts, the assertion is considered conclusory and cannot be utilized in support of or against a motion for summary judgment." <u>Id.</u> (cleaned up) (quoting <u>Nozawa</u>, 142 Hawaiʻi at 339, 418 P.3d at 1195).

If the court concludes (based on the factual allegations in the complaint and the evidence presented by the plaintiff) that the moving defendant is entitled to judgment as a matter of law, the court should grant summary judgment in favor of the defendant; if not, the court should deny the defendant's motion.  <u>Andrade</u>, 145 Hawaiʻi at 270-71, 451 P.3d at 6-7.  Where the plaintiff does not file their own motion for summary judgment, the defendant's failure to controvert the evidence presented by the plaintiff in opposition to an HRCP Rule 12(b)(6) motion to dismiss does not constitute a concession or admission. <u>Id.</u> at 271 n.8, 451 P.3d at 7 n.8.

### **Statutory Interpretation**

"Interpretation of a statute is a question of law which we review de novo."  <u>Reyes-Toledo</u>, 143 Hawaiʻi at 257, 428 P.3d at 769 (citations omitted).

> The fundamental starting point of statutory interpretation is the language of the statute itself, and where the statutory language is unambiguous, our duty is to give effect to its plain and obvious meaning.  To effectuate a

> statute's plain language, its words must be taken in their ordinary and familiar signification, and regard is to be had to their general and popular use. In conducting a plain meaning analysis, [a] court may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.
>
> It is also a canon of construction that statutes that are in pari materia may be construed together. Thus, laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.

Wells Fargo Bank, N.A. v. Omiya, 142 Hawaiʻi 439, 449-50, 420 P.3d 370, 380-81 (2018) (cleaned up).

## **DISCUSSION**

Flores's complaint specifically alleged that the Chiefs of Police violated HRS § 52D-5. The Order Granting MTD was specifically based upon the circuit court's conclusion "that there is no private right of action pursuant to Haw. Rev. Stat. § 52D-5." On appeal Flores asserts a number of legal theories under which a private right of action for violation of HRS § 52D-5 could be recognized. As we explain below, HRS § 52D-5 is an enabling statute that was never properly implicated based upon the evidence in the record. Because the circuit court correctly disposed of the case, however, the result will not be disturbed on the ground that the circuit court gave the wrong reason for its ruling. See, e.g., Tauese v. State, Dep't of Labor & Indus. Relations, 113 Hawaiʻi 1, 15 n.6, 147 P.3d 785, 799 n.6 (2006) (citing cases). In our de novo review we "may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it." Id. (citations omitted).

But we must first address Chief Ballard's and Chief Faaumu's arguments that Flores's claims are moot because HPD and MPD officers are no longer present on Hawaiʻi Island to exercise police power. Although it did not form the basis for the circuit court's decision and (as Flores points out) the Chiefs of Police do not argue mootness in their joint answering brief, "mootness is an issue of subject matter jurisdiction." Hamilton ex rel. Lethem v. Lethem, 119 Hawaiʻi 1, 4, 193 P.3d 839, 842 (2008).

Every court must determine "as a threshold matter whether it has jurisdiction to decide the issue presented." Pele Def. Fund v. Puna Geothermal Venture, 77 Hawaiʻi 64, 67, 881 P.2d 1210, 1213 (1994) (citation omitted).

### Flores's claims are moot, but two exceptions to the mootness doctrine apply.

> The mootness doctrine is said to encompass the circumstances that destroy the justiciability of a suit previously suit-able for determination.  Put another way, the suit must remain alive throughout the course of litigation to the moment of final appellate disposition.  Its chief purpose is to assure that the adversary system, once set in operation, remains properly fueled.  The doctrine seems appropriate where events subsequent to the judgment of the trial court have so affected the relations between the parties that the two conditions for justiciability relevant on appeal — adverse interest and effective remedy — have been compromised.

Hamilton, 119 Hawaiʻi at 5, 193 P.3d at 843 (citations omitted). The parties do not dispute that the HPD and MPD officers who had been supporting HCPD's TMT protest response have left Hawaiʻi Island.  That makes Flores's appeal moot; the Chiefs of Police are no longer doing anything that a court could enjoin.  But there are exceptions to the mootness doctrine — the "capable of repetition, yet evading review" exception and the "public interest" exception — that apply here.[7]  See id.

> The phrase, "capable of repetition, yet evading review," means that "a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit."

Id. (citation omitted).  The "capable of repetition, yet evading review" exception applies because Chief Ballard and Chief Faaumu both declined to give the "assurance" requested by Flores's counsel that HPD or MPD would not return to Hawaiʻi Island in the future.  Although TMT construction has paused because of the

---

[7]     A third exception, the "collateral consequences" exception, was adopted by the supreme court in Hamilton but is not applicable here.  See generally 119 Hawaiʻi at 7-10, 193 P.3d at 846-48.

COVID-19 pandemic and the TMT protesters have withdrawn from Puʻu Huluhulu, there is no indication in the record that the situation could or would not be repeated once construction resumes.

> When analyzing the public interest exception, [a] court looks to (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for future guidance of public officers, and (3) the likelihood of future recurrence of the question.

Id. at 6-7, 193 P.3d at 844-45 (cleaned up).  All the elements of the "public interest" exception are present in this case.  We have jurisdiction to decide this appeal.

### HRS § 52D-5 is not implicated by the facts alleged in Flores's complaint or established by Flores's evidence.

HRS § 52D-5 (2012) provides:

The chief of police of each county and any duly authorized subordinates shall have and may exercise all powers, privileges, and authority necessary to enforce the laws of the State, in a county other than the county in and for which the chief has been appointed, if:

> (1)  The exercise of such power, privilege, and authority is required in the pursuit of any investigation commenced within the county in and for which the chief has been appointed; and

> (2)  The concurrence of the chief of police of the county in which the power, privilege, and authority sought to be exercised is obtained.

(Underscoring added.)  The statute enables a police chief to ask a police chief in another county to allow the requesting chief to exercise police authority in the other chief's county to pursue an investigation originating in the requesting chief's county.

We need not decide whether there is a private right of action for an alleged violation of HRS § 52D-5 because the statute was not violated.  As Flores correctly points out, this case does not involve an "investigation commenced within the county in and for which" Chief Ballard or Chief Faaumu were appointed.  HRS § 52D-5 does not authorize Chief Ballard or Chief Faaumu, even with the concurrence of Chief Ferreira, to send HPD or MPD officers to Hawaiʻi Island to exercise police power in

response to the TMT protest on Hawaiʻi Island.  But that does not mean any of the Chiefs of Police violated HRS § 52D-5.

The police action of which Flores complained did not arise because Chief Ballard or Chief Faaumu asked Chief Ferreira for permission to send officers to Hawaiʻi Island to respond to TMT protesters.  It was Chief Ferreira who asked the other chiefs to send officers to Hawaiʻi Island to assist HCPD in handling matters on Hawaiʻi Island that strained HCPD's resources.  Neither Chief Ballard nor Chief Faaumu purported to exercise police authority in the County of Hawaiʻi "in the pursuit of any investigation commenced within" the City and County of Honolulu or the County of Maui.  Viewing the allegations and facts in the light most favorable to Flores, HRS § 52D-5 was never implicated, much less violated.  It was thus appropriate for the circuit court to dismiss Flores's complaint based upon the alleged violation of HRS § 52D-5 by the Chiefs of Police, whether or not a private right of action for violation of the statute exists.

### HRS § 78-27 authorizes temporary assignment of police officers from one county to another.

The Chiefs of Police contend that their respective actions were taken pursuant to materially identical inter-departmental assignment agreements (**Agreements**), one signed by Chief Ferreira and Chief Ballard and the other by Chief Ferreira and Chief Faaumu.  Flores presented both Agreements in opposition to Chief Ballard's MTD.  The Agreements were not excluded by the circuit court.  The Agreements are properly before us on this appeal.

The Agreements contained the following recitals:

> WHEREAS, HCPD desires the services of [HPD/MPD] personnel and [HPD/MPD] has agreed to the temporary assignment of [HPD/MPD] personnel and [sic] to support and manage police operations in conjunction with the Thirty Meter Telescope Project ("TMT Project") and any other assignment as deemed necessary by the HCPD Chief of Police or his designee with the approval of [HPD/MPD]; and
>
> WHEREAS, this employment is a temporary inter-departmental assignment and this employment is made under the provisions of Hawaii Revised Statutes [§] 78-27(a-d).

HRS § 78-27 (2012) provides:

**Temporary inter- and intra-governmental assignments and exchanges**. (a) With the approval of the respective employer, a governmental unit of this State may participate in any program of temporary inter- or intra-governmental assignments or exchanges of employees as a sending or receiving agency. "Agency" means any local, national, or foreign governmental agency or private agency with government sponsored programs or projects.

(b) As a sending agency, a governmental unit of this State may consider its employee on a temporary assignment or exchange as being on detail to a regular work assignment or on leave of absence without pay from the employee's position. The employee on temporary assignment or exchange shall be entitled to the same rights and benefits as any other employee of the sending agency.

(c) As a receiving agency, a governmental unit of this State shall not consider the employee on a temporary assignment or exchange who is detailed from the sending agency as its employee, except for the purpose of disability or death resulting from personal injury arising out of and in the course of the temporary assignment or exchange. The employee on detail may not receive a salary from the receiving agency, but the receiving agency may pay for or reimburse the sending agency for the costs, or any portion of the costs, of salaries, benefits, and travel and transportation expenses if it will benefit from the assignment or exchange.

(d) <u>An agreement consistent with this section</u> and policies of the employer <u>shall be made between the sending and receiving agencies</u> on matters relating to the assignment or exchange, including but not limited to <u>supervision of duties, costs of salary and benefits, and travel and transportation expenses</u>; provided that the agreement shall not diminish any rights or benefits to which an employee of a governmental unit of this State is entitled under this section.

(e) <u>As a receiving agency, a governmental unit</u> of this State <u>may give the employee of the sending agency on a temporary assignment</u> or exchange <u>an exempt appointment</u> and grant the employee rights and benefits as other exempt appointees of the receiving agency if it will benefit from the assignment or exchange.

(Underscoring added.)

Flores acknowledges that Act 253 of the 2000 legislative session, which resulted in the enactment of HRS § 78-27, mentions "police" three times.[8] HRS § 78-27 thus contemplates the police department of one county, as a "sending agency,"

---

[8] Section 74 refers to workers compensation benefits for police officers. Section 96 refers to a collective bargaining unit for police officers. Section 100 refers to resolution of labor grievances involving the police officers' collective bargaining unit. 2000 Haw. Sess. Laws Act 253.

14

temporarily assigning officers to the police department of another county, as the "receiving agency"; the statute protects the temporarily assigned police officers' civil service, collective bargaining, workers' compensation, and other employment rights and benefits during the temporary assignment.

The Agreements contained the following provisions consistent with HRS § 78-27(d):

> 3.    It is the understanding of the parties that the State Attorney General's Office has agreed to pay for and/or reimburse the Sending Agency for the costs, any portion of the costs, overtime, benefits, and travel and transportation expenses on behalf of the Receiving Agency.  However, HCPD shall ultimately be responsible for said costs and expenses should the State Attorney General's Office fail to pay for and/or reimburse the Sending Agency for any expenditures related to the TMT Project and any other assignment as deemed necessary by the HCPD Chief of Police or his designee with the approval of [HPD/MPD].  Such expenses may be paid for or reimbursed to the [HPD/MPD].
>
> 4.    The [HPD/MPD] personnel are to carry out and observe all lawful instructions and orders issued by the appointing authority or designee relative to employment.
>
> 5.    The [HPD/MPD] personnel shall perform all of the work under the supervision of an immediate supervisor in the Sending Agency or any other person in the Receiving Agency who has the authority to supervise the activities.
>
> . . . .
>
> 9.    This employment will be subject to all laws, ordinances, and rules and regulations having the effect of law governing employment of public employees; and
>
> 10.    Any and all collective bargaining agreements pertinent to [HPD/MPD] personnel's regular positions with the [HPD/MPD] shall apply, including but not limited to salary.

The Chiefs of Police are correct that the temporary assignment of HPD and MPD officers to Hawaiʻi Island to support HCPD's TMT-related operations was authorized by HRS § 78-27.  But HRS § 78-27 itself does not authorize a police officer sworn in one county to exercise police power in another county.  For that proposition we must look to other applicable law.

> **Chief Ferreira was authorized to delegate
> police power to HPD and MPD officers who
> <u>were temporarily assigned to HCPD.</u>**

Flores agrees that HRS Chapter 78 "concerns employee benefits, rights, [and] exchange of public employees" and acknowledges that police officers are mentioned in the law, but explains that his "lawsuit was not about mutual aid agreements." He maintains that "[t]he gravamen of [his] lawsuit is that the ability to detain and/or arrest someone is a distinct power and authorization conferred upon an individual by the government." He argues — correctly — that nothing in HRS Chapter 78 or its legislative history specifies that "the law was created to allow police officers of the respective counties to exercise their police powers beyond their home counties." This requires us to examine whether Chief Ferreira had the authority to grant police powers to HPD and MPD officers temporarily assigned to HCPD.

The Agreements each include a "Delegation of Police Authority" signed by Chief Ferreira (**Delegations**). They state:

> Under the authority of the Chief of Police, of Hawaiʻi County Police Department, the following officers of the [HPD/MPD] (please see attached list), are granted full police officer power, privilege and authority, under HRS [§] 52D-5. The purpose of this delegation of authority, while assigned to Hawaiʻi county will be to support and manage police operations in conjunction with the Thirty Meter Telescope project and any other assignment as deemed necessary by the Hawaiʻi County Police Chief or his designee. This delegation of Police authority shall be effective from July 16, 2019 until the end of police operations for this project as deemed necessary by the Hawaiʻi County Chief of Police.

The citation to HRS § 52D-5 was inapt. As discussed above, HRS § 52D-5 does not apply to the circumstances described by the Delegations. But that does not mean Chief Ferreira's delegation of police powers within Hawaiʻi County to HPD and MPD officers was not authorized.

Chief Ferreira is the Chief of HCPD. His authority as chief of police is conferred by state statute and county charter. HRS § 52D-3 (2012) provides:

> The chief of police shall have the powers and duties as prescribed by law, the respective county charter, and as provided by this chapter.

Chapter 2 of the Hawaiʻi County Charter (2018)[9] provides, in relevant part:

> **Section 7-2.1.  Organization.**
>
> There shall be a police department consisting of a police commission, a chief of police, a deputy chief of police, and the necessary staff.
>
> . . . .
>
> **Section 7-2.4.  Powers, Duties, and Functions of the Chief of Police.**
>
> The chief of police shall be the administrative head of the police department and shall:
>
> > (a)  Be responsible for the preservation of the public peace, prevention of crime, detection and arrest of offenders against the law, protection of the rights of persons and property, and enforcement and prevention of violations of all laws of the state and ordinances of the county and all regulations made in accordance therewith.
> >
> > (b)  <u>Train, equip, maintain, and supervise the force of police officers</u> and employees.
> >
> > (c)  Promulgate rules and regulations for the organization and administration of the police force.
> >
> > (d)  Make periodic reports to the police commission about the activities of the police department and about actions taken on cases investigated by the police commission.
> >
> > (e)  <u>Have such other powers, duties, and functions as</u> may be required by the police commission or <u>provided by law</u>.

(Underscoring added.)  HRS § 52D-6 (2012) provides:

> <u>The chief of police may appoint officers</u> and other employees <u>under such rules and at such salaries as are authorized by law</u>.  Probationary appointment, suspension, and dismissal of officers and employees of the police department shall be as authorized by law.

---

[9]  Although the 2020 Hawaiʻi County Charter is now in effect, there were no substantive amendments to the sections discussed in this opinion.  <u>See</u> Charter of the County of Hawaiʻi §§ 7-2.1, 7-2.4 (2020), https://records.hawaiicounty.gov/weblink/DocView.aspx?dbid=1&id=109506&cr=1.

(Underscoring added.)

HRS § 78-27 is a law that authorizes Chief Ferreira to temporarily receive police officers from another county's police department to support HCPD operations on Hawaiʻi Island.  HRS § 78-27 also authorizes Chief Ballard and Chief Faaumu to temporarily assign police officers from their respective departments to another county's police department.  The Hawaiʻi County Charter and HRS Chapter 52D authorize Chief Ferreira to appoint and supervise police officers in the County of Hawaiʻi, including those temporarily assigned to Hawaiʻi Island from Honolulu and Maui counties.  Applying the plain language of HRS §§ 52D-3, 52D-6, and 78-27, and Chapter 2 of the Hawaiʻi County Charter, in pari materia, we hold that execution and performance of the Agreements and the Delegations by the Chiefs of Police in this case was authorized by law.

**CONCLUSION**

The presence of HPD and MPD police officers on Hawaiʻi Island to support HCPD's TMT-related operations, at the request and under the supervision of the Chief of the HCPD, was a valid exercise of police power under the Hawaiʻi County Charter, HRS Chapter 52, and HRS § 78-27.  The Order Granting Defendant Susan Ballard's Motion to Dismiss and the Judgment entered by the Circuit Court of the Third Circuit on November 12, 2019, are affirmed.

On the briefs:

Peter S.R. Olson,
for Plaintiff-Appellant.

Ernest H. Nomura,
Robert M. Kohn,
Nicolette Winter,
Deputies Corporation Counsel,
for Defendant-Appellee
Susan Ballard.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge

Peter A. Hanano,
Deputy Corporation Counsel,
for Defendant-Appellee
Tivoli Faaumu.

Laureen L. Martin,
Deputy Corporation Counsel,
for Defendant-Appellee
Paul Ferreira.

Richard F. Nakamura,
Steven L. Goto,
Alan D. Cohn, pro hac vice,
Jason E. Meade, pro hac vice,
for Amicus Curiae International
Municipal Lawyers Association, Inc.